OPINION
{¶ 1} Plaintiff-appellant, Richard Roe, in his capacity as father and next friend of John Roe, a minor, appeals from the judgment of the Franklin County Court of Common pleas rendering summary judgment in favor of defendants-appellees, Donna Heap ("Heap") and Jennifer Scheibeck ("Scheibeck").[1] By order of the trial court, Richard Roe and John Roe are so referred to in the pleadings of record in order to shield them from public scrutiny due to the embarrassing nature of the circumstances from which this case arises. We will employ the same pseudonyms in this opinion.
 {¶ 2} The following facts are not in dispute. John Roe and the daughters of Heap and Scheibeck were members of a local diving club called Central Ohio Diving. Central Ohio Diving is a member of a national organization called United States Diving, Inc. ("USD"). John Roe competed in platform diving for a branch of Central Ohio Diving called Creed, and did so from the year 2000 through October 2002. Heap's daughter dove for Creed from late 2000 or early 2001, through sometime in 2002. Scheibeck's daughter dove for Creed from late 2000 or early 2001, through at least April 2002.
 {¶ 3} On January 18, 2001, John Roe was charged with several delinquency counts as a result of an assault alleged to have occurred on January 11, 2000, during or after a Creed practice held at The Ohio State University Pepe Aquatic Center. At the time of the alleged incident, Heap and Scheibeck's daughters were members of Central Ohio Diving, but were not members of Creed. John Roe, then age 12, was alleged to have perpetrated the assault, as well as gross sexual imposition, upon a 14-year-old girl.
 {¶ 4} After a hearing before a magistrate of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, the magistrate recommended that John Roe be adjudicated delinquent for assault and gross sexual imposition. The magistrate's decision was filed on February 12, 2002.
 {¶ 5} On February 18, 2002, Heap sent an e-mail message concerning John Roe to seven individuals who occupied leadership positions with USD. In the subject line of the e-mail message, Heap typed, "Junior US Diver convicted of sexual crimes." The full text of the e-mail is as follows:
Dear US Diving,
I am a very concerned parent of a junior US Diver. It is my understanding that another junior US diver by the name of [John Roe, also of Columbus, Ohio], has recently been convicted of sexual crimes against another junior US Diver. It is also my understanding that he is still allowed to participate in US Diving meets. How is this possible? How can US Diving allow other junior divers be [sic] exposed unknowingly to this person? How can US Diving allow a convicted sexual offender participate [sic] in a meet where his victim is competing? Where are the rights of the other junior members and the victim?
I strongly believe that he should NOT BE ALLOWED to participate in any meets. At the very least every single parent should be notified of this diver's sexual crimes so that they may protect their own children.
I will be very vigilant in trying to keep my daughter safe but as you probably know it is impossible to keep an eye on your child at all times. And just knowing that this crime took place at a diving pool makes me all the more nervous.
My first priority is keeping my daughter safe. If anything happens to her at a US Diving meet involving this diver when US Diving knowingly allowed a convicted sexual offender to participate I would pursue legal (both criminal and monetary) consequences for US Diving.
Please do not look the other way. Choose the right and safe thing for all your junior members.
Please keep me informed as to the outcome of this request. If I hear nothing I do intend to pursue this issue. Our children are at stake.
Thank you very much for your time and consideration.
Sincerely, Donna Heap
 {¶ 6} Heap also discussed John Roe, using essentially the same language used in the e-mail, with three of her friends, her mother and her sister.
 {¶ 7} On March 18, 2002, Scheibeck sent an e-mail message regarding John Roe to four of the seven USD officials to whom Heap had sent her message, and also to two other individuals apparently in positions of authority at USD. In the subject line of the e-mail message, Scheibeck typed, "Potential Competitor/Convicted Felon." The full text of the e-mail is as follows:
To whom it may concern:
I am writing this e-mail to express my concerns regarding a glaring omission in the current U.S. Diving Rules and Regulations for competitors. I currently have an 11 year-old daughter who participates in U.S. Diving competitions. I understand that there is also a competitor [John Roe] who has been convicted of a felony as a minor and could find no "Rules" that address this. This presents an unwarranted risk to my daughter and to other competitors of this sport.
U.S. Swimming very specifically addresses this stating that a person who has been convicted of a felony is no longer eligible to participate in U.S. Swimming events. U.S. Diving needs to have a rule to address this too, but first and foremost, we need to make sure that this individual is not allowed to compete at the upcoming Junior Regional Meets. This is an unnecessary exposure to all of the children who are participating in this event and will certainly not be a positive reflection of the types of athletes that U.S. Diving would want representing our sport. This is a felony conviction.
As an Insurance professional, I have two recommendations. First, review the risk and the legal liability that you are assuming in allowing this person to participate. Should anything occur, the liability would fall on U.S. Diving. What type of price do you think a jury would award a victim if the exposure were known prior to something happening? Secondly, check with your legal representation. I am confident that both will recommend that this be avoided as undo [sic] risk. A local club here, had to make the same difficult decision and ask that he not continue to participate in their diving program. U.S. Diving needs to do the same.
I was unable to forward this letter to the owner of the Indianapolis Starz Diving Club, but hope that U.S. Diving will take all necessary steps to notify them of my concern. I am sure that most parents would have the same concern. No felony conviction should be taken lightly and while I am unaware of all of the specifics, I do know that the charges were brought by another competitor based on an event that occurred at a diving practice.
As a group, we want positive press and a strong commitment to values and conduct in our sport. I trust that U.S. Diving will choose to eliminate this risk, eliminate the negative exposure and to place very specific rules in place to prevent a situation that could potentially bring the entire organization to it's [sic] knees.
As a family, we are looking forward to a long and rewarding relationship with U.S. Diving. Having participated in other U.S. sponsored sports in the past, I am sure that this is just simply an oversight and that the necessary precautionary measures are taken to insure the safety and well being of all participants. I am hoping that you will advise me of the intentions of U.S. Diving so that I have some peace of mind when escorting my daughter to these events. I will look forward to hearing from you regarding this matter.
Sincerely, Jennifer Scheibeck
 {¶ 8} Scheibeck also discussed John Roe with her husband and with Jill and John McCambridge, the proprietors and coaches of Central Ohio Diving. At her deposition, Scheibeck testified that she confirmed that John Roe had been "convicted" of a "felony" during a telephone conversation with an assistant prosecuting attorney for Franklin County, but admitted that this conversation may not have occurred until after she sent her March 18, 2002 e-mail.
 {¶ 9} On April 22, 2002, appellant instituted this action against Heap and Scheibeck. The complaint contains counts sounding in defamation, invasion of privacy, intentional infliction of emotional distress and negligent infliction of emotional distress. After Heap and Scheibeck filed their answers, Heap filed a motion seeking to obtain the Franklin County Juvenile Court file pertaining to the proceedings involving John Roe. Heap argued that the court file was crucial to validation of the truthfulness of the statements subject of appellant's claims.
 {¶ 10} Appellant filed a memorandum in opposition to the motion, and also filed a motion for a protective order that the discovery not be had, pursuant to Civ.R. 26(B)(1). Appellant argued that the juvenile proceedings against his son had not yet concluded; thus, he argued, the juvenile court file would not assist Heap in assessing the truthfulness of her allegedly tortious statements. He also argued that Ohio decisional law and the local rules of the Franklin County Juvenile Court strictly limit access to juvenile court records. Finally, he argued alternatively that the Franklin County Juvenile Court may be the only judicial entity empowered to grant Heap access to its file. In requesting the protective order, appellant argued that the order was necessary to protect John Roe from embarrassment, pursuant to Civ.R. 26(C). In the alternative, appellant requested an in camera inspection and appropriate limitation on Heap's discovery of the juvenile court file. In response, Heap argued that there was a genuine question whether John Roe's juvenile delinquency proceedings had concluded. She also argued that access to the juvenile court file was necessary to the determination whether Heap's allegedly defamatory statements were true at the time they were made.
 {¶ 11} The trial court ordered an in camera inspection of John Roe's juvenile court file. Upon completion of the in camera inspection, by entry journalized September 25, 2002, the court released to counsel for all parties "certain portions of that Juvenile Court file that the Court deems relevant to the defense of this case." Meanwhile, two days earlier, on September 23, 2002, the judge assigned to John Roe's juvenile court case held a dispositional hearing on the matter. At the hearing, the petition was amended to include one charge of disorderly conduct, the juvenile court accepted John Roe's Alford plea to that charge, and the petition was dismissed. The juvenile court also ordered the records expunged, pursuant to R.C. 2151.358.
 {¶ 12} On October 21, 2002, appellant filed a motion for reconsideration of the trial court's decision to release portions of the juvenile court record. The motion for reconsideration was based upon the fact that the Franklin County Juvenile Court had found John Roe delinquent only of one count of disorderly conduct, the other charges had been dismissed and the juvenile court had ordered its file regarding John Roe's case sealed and expunged. On January 17, 2003, the trial court journalized an entry overruling appellant's request for reconsideration.
 {¶ 13} On January 27, 2003, Scheibeck filed a motion seeking summary judgment as to appellant's invasion of privacy and intentional infliction of emotional distress claims. On January 31, 2003, Heap filed a motion seeking summary judgment as to all of appellant's claims against her. The trial court sustained both motions.
 {¶ 14} Appellant timely appealed the judgment and presents the following six assignments of error for our review:
Assignment of Error No. 1
The trial court erred in granting summary judgment to defendant, Donna Heap, on the defamation claim, invasion of privacy claim and the intentional infliction of emotional distress claim.
Assignment of Error No. 2
The trial court erred in granting summary judgment to defendant, Jennifer Sceibeck [sic], on the invasion of privacy claim and intentional infliction of emotional distress claim.
Assignment of Error No. 3
The trial court erred in finding that the juvenile court proceedings and records were public in nature.
Assignment of Error No. 4
The trial court erred in finding that the innocent construction rule applied to the words "conviction," "sexual offense" and "felony."
Assignment of Error No. 5
The trial court erred in failing to recognize a "false light" theory of invasion of privacy.
Assignment of Error No. 6
The trial court erred in failing to set forth a statement of facts upon which the trial court based the decision to grant summary judgment.[2]
 {¶ 15} We view the trial court's grant of summary judgment independently and without deference to the trial court's determinations. Brown v. Cty. Commrs. (1993),87 Ohio App.3d 704. In conducting our review, this court applies the same standard the trial court employed. Maust v. Bank One Columbus,N.A. (1992), 83 Ohio App.3d 103, jurisdictional motion overruled (1993), 66 Ohio St.3d 1488. Summary judgment should be rendered only where the evidence demonstrates that: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C);State ex rel. Grady v. State Employee Relations Bd. (1997),78 Ohio St.3d 181.
 {¶ 16} Under Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. Dresher v. Burt (1996),75 Ohio St.3d 280. Once the moving party discharges its initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial.Dresher, supra, at 293; Vahila v. Hall (1997),77 Ohio St.3d 421; Civ.R. 56(E).
 DEFAMATION {¶ 17} We begin with appellant's claim against Heap for defamation. The trial court granted summary judgment in favor of Heap on this claim because it determined that Heap's statements were "substantially true" and were susceptible to an "innocent construction." In his first assignment of error, appellant argues that Heap is not entitled to summary judgment on his claim against her for defamation. In his fourth assignment of error, he argues the trial court erred in applying the "innocent construction" rule to Heap's allegedly defamatory statements. Accordingly, we will address appellant's first and fourth assignments of error concurrently, in evaluating the propriety of the trial court's grant of summary judgment on appellant's defamation claim against Heap.
 {¶ 18} Defamation, which includes both libel and slander, is a false publication causing injury to a person's reputation, exposing the person to public hatred, contempt, ridicule, shame or disgrace, or affecting the person adversely in his or her trade or business. Sweitzer v. Outlet Communications, Inc.
(1999), 133 Ohio App.3d 102, 108, citing Matalka v. Lagemann
(1985), 21 Ohio App.3d 134, 136. Slander refers to spoken defamatory words, while libel refers to written or printed defamatory words. Mallory v. Ohio Univ. (Dec. 20, 2001), Franklin App. No. 01 AP-278, citing Lawson v. AK Steel Corp.
(1997), 121 Ohio App.3d 251, 256.
 {¶ 19} Actionable defamation falls into two categories, defamation per quod or per se. McCartney v. Oblates of St.Francis deSales (1992), 80 Ohio App.3d 345, 353; Mallory,
supra. In defamation per quod, a publication is merely capable of being interpreted as defamatory, and the plaintiff must allege and prove damages. Dodley v. Budget Car Sales, Inc. (Apr. 20, 1999), Franklin App. No. 98AP-530.
 {¶ 20} To constitute defamation per se, the "words must be of such a nature that courts can presume as a matter of law that they tend to degrade or disgrace the person of whom they are written or spoken, or hold him up to public hatred, contempt or scorn." Moore v. P.W. Publishing Co. (1965), 3 Ohio St.2d 183,188, certiorari denied (1966), 382 U.S. 978, 86 S.Ct. 549. When a statement is found to be defamation per se, both damages and actual malice are presumed to exist. Dodley, supra, citingWestropp v. E.W. Scripps Co. (1947), 148 Ohio St. 365, paragraph four of the syllabus; King v. Bogner (1993),88 Ohio App.3d 564, 567-568; McCartney, supra, at 354. Whether a statement is defamation per se is a question of law that an appellate court properly may determine. Becker v. Toulmin
(1956), 165 Ohio St. 549, 554; DeMuesy v. Haimbaugh (Dec. 31, 1991), Franklin App. No. 91AP-212; Sethi v. WFMJ Television,Inc. (1999), 134 Ohio App.3d 796, 804.
 {¶ 21} To establish defamation, a plaintiff must show: (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff was injured as a result of the statement, and (5) the defendant acted with the required degree of fault. Sweitzer, supra, at 108.
Substantial Truth
 {¶ 22} "[F]alsity is an essential element to a libel action; therefore, a true statement cannot provide the basis for such an action." Natl. Medic Services Corp. v. E.W. Scripps Co. (1989),61 Ohio App.3d 752, 755, citing Driscoll v. Block (1965),3 Ohio App.2d 351. "It is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the `gist,' the `sting,' or the substantial truth of the defamation." Prosser, Law of Torts (4th Ed. 1971) 798-799. Whether a defamatory statement is substantially true is a question of fact. Sweitzer, supra, at 110. Thus, in accordance with the authorities cited hereinabove, summary judgment may be granted on the ground that a defamatory statement is "substantially true" only if there appears, from the evidence submitted pursuant to Civ.R. 56, that no genuine issue of fact exists with respect to this issue.
 {¶ 23} In the present case, it is undisputed that, at the time Heap sent her allegedly defamatory e-mail, a juvenile court magistrate had issued a decision recommending to the juvenile court that John Roe be adjudicated a delinquent child for one count of assault and one count of gross sexual imposition. It is also undisputed that, at the time Heap sent her allegedly defamatory e-mail, John Roe's juvenile court case awaited a final dispositional hearing before a juvenile court judge.
 {¶ 24} The trial court herein found that Heap's statements that John Roe had been "convicted of sexual crimes" and was a "convicted sexual offender" were substantially true, and based this conclusion, in part, on quoted materials taken from the magistrate's decision of record in John Roe's delinquency case. The trial court explained its finding thusly:
However, "convict" can mean "[t]o show or declare to be blameworthy," as well as "[t]o find or prove (someone) guilty of an offense or crime, especially by the verdict of a court." The American Heritage Dictionary of the English Language (4th ed. 2000). In the present case, the Magistrate "declared" John Roe to be "blameworthy" of "having committed the offense of gross sexual imposition, in violation of section 2907.05(A)(1) of the Ohio Revised Code, a felony of the fourth degree," on the basis of which the Magistrate found John Roe "to be a delinquent minor child."
Even the law-related definition recognizes that "convict" can refer to an "offense" other than a "crime" and "especially" — but not always — refers to a finding made "by the verdict of a court." "Court" also has a number of meanings, including "[a] person or body of persons whose task it is to hear and submit a decision on cases at law," in addition to "[t]he regular session of a judicial assembly." Id. In the present case, the Magistrate, while not a judge, "hear[s] and submit[s] a decision on cases at law" and issued a recommendation to Judge Squire, based on his "find[ing]" that John Roe had "committed the offense of gross sexual imposition."
Defendant Heap's statements were thus truthful as a matter of law.
(April 15, 2003, Decision Granting Summary Judgment, 7-8.)
 {¶ 25} The trial court went on to note:
* * * even if "convicted of sexual crimes" incorrectly described the Magistrate's recommendation, "[e]rrors in terminology do not prevent the published report from being substantially true." See Mucci [v. Dayton Newspaper, Inc.
(Montgomery C.P. 1995), 71 Ohio Misc.2d 71] at 76.
(Id. at 8-9.)
 {¶ 26} On appeal, appellant argues that Heap made much more than an error in terminology. He argues that, at the time Heap made the alleged defamatory statements regarding John Roe, John Roe could not have been "convicted" of any crime, because the juvenile justice system does not contemplate convictions. Additionally, appellant argues, when Heap sent her e-mail, no determination at all as to whether John Roe committed any offense had been made by anyone possessing the authority to do so under the rules of the juvenile court. Appellant points out that, pursuant to Juv.R. 40, the conclusions reached in a magistrate's decision do not become effective until a judge of the juvenile court expressly adopts them. Thus, according to appellant, the trial court abused its discretion in determining that the juvenile court magistrate's decision lent any "substantial truth" to Heap's allegedly defamatory statements.
 {¶ 27} Quoting from the juvenile court magistrate's decision in John Roe's delinquency case, Heap argues that the magistrate's use of the words "committed the offense of gross sexual imposition, a felony of the fourth degree" plainly demonstrates the substantial truth of Heap's allegedly defamatory statements. As the trial court did, Heap directs our attention to dictionary definitions. Heap argues that her words may have been technically inaccurate, but were nonetheless substantially true.
 {¶ 28} Heap relies for support of her position on the cases of Saferin v. Malrite Communications Group, Inc. (Mar. 24, 2000), Lucas App. No. L-99-1193, Bruss v. Vindicator PrintingCo. (1996), 109 Ohio App.3d 396, and Hauck v. Gannett Corp.
(Mar. 20, 1998), Hamilton App. No. C-970171. She argues these cases support the trial court's finding that, despite Heap's mere "errors in terminology," her statements were substantially true.
 {¶ 29} Saferin, Bruss and Hauck involve media defendants sued as a result of newspaper articles or television news broadcasts. In Saferin, a plastic surgeon, acting on behalf of a corporation of which he was president, entered a guilty plea to two counts of insurance fraud with which the corporation had been charged. He later filed suit against the owner of a television station that aired a report stating, inter alia, that Saferin himself had pled guilty to insurance fraud. Saferin claimed the report was defamatory because the corporation — not the doctor himself — had been indicted and pled guilty. The court of appeals affirmed the trial court's grant of summary judgment to the defendant. The court stated that, even though the one who pled guilty was the corporation and not Saferin, the news story was substantially true because Saferin was the president and only one of two shareholders of the corporation, he was the principal shareholder, and he was the surgeon who performed the acts that led to the corporation's insurance fraud.
 {¶ 30} In Bruss, the local prosecutor filed a civil nuisance complaint against an establishment and certain of its employees, including the plaintiff, alleging that certain employees engaged in nude dancing for purposes of prostitution. In a story about the complaint, the local newspaper reported, "[a]lso charged but not arrested" was the plaintiff, who was "also named as [a defendant] in today's complaint." The court in which the nuisance case had been filed later adjudged the establishment to be a nuisance. The plaintiff brought a defamation suit against the newspaper, which obtained summary judgment in the trial court. In affirming the judgment, the court of appeals concluded that the article was substantially true because the word "charged" is not restricted to formal criminal charges but could also mean "accused" in a civil case.
 {¶ 31} In Hauck, the court determined that a newspaper report describing the plaintiff as "bankrupt" was substantially true, even though the plaintiff had not filed a petition in bankruptcy, because the plaintiff had previously admitted he was "insolvent."
 {¶ 32} Similarly, in the case of Orr v. Argus-Press Co.
(C.A. 6, 1978), 586 F.2d 1108, the court upheld summary judgment in favor of the defendant newspaper, when the newspaper reported that the plaintiff had been charged with "fraud" when he had actually been charged with violating state securities laws by selling unregistered securities and by making misrepresentations in connection with offering securities for sale. The court held that the report was substantially true because the language of the state securities law under which the plaintiff was charged prohibits various forms of securities fraud.
 {¶ 33} The foregoing cases do not compel the same result in the present case. First, we seriously question the rationale of the court in Saferin. Moreover, in all of the preceding cases, the courts determined that the "gist" or "sting" of the allegedly defamatory statement would be virtually unchanged had the statement been more accurately worded. In other words, the allegedly defamatory verbiage did not signify facts substantially different from the actual facts being described or reported. In the present case, there exists a far greater disparity between the substance and import of appellees' communications, and the truth concerning the events discussed therein.
 {¶ 34} Heap wrote that John Roe had been "convicted." "Conviction" is defined as, "[t]he act or process of judicially finding someone guilty of a crime. * * * The judgment (as by a jury verdict) that a person is guilty of a crime." Black's Law Dictionary (7 Ed. 1999) 335. (Emphasis added.) Only a trial court can render a judgment. Zacek v. Zacek (1983),11 Ohio App.3d 91, paragraph three of the syllabus. Even when a matter is referred to a magistrate, pursuant to Civ.R. 53, the trial court remains the ultimate finder of fact. As the Supreme Court of Ohio stated in Normandy Place Assoc. v. Beyer (1982),2 Ohio St.3d 102, "[i]t is the primary duty of the court, and not the [magistrate], to act as a judicial officer." Id. at 105. "[Magistrates] serve only in an advisory capacity to the court and have no authority to render final judgments affecting the rights of parties." Nolte v. Nolte (1978), 60 Ohio App.2d 227, paragraph two of the syllabus.
 {¶ 35} The Ohio Rules of Civil Procedure clearly provide that the trial court must make its own factual determination by undertaking an independent analysis of the issues. The trial court is bound to enter its own judgment, and fully substitutes its own judgment for any findings of the magistrate. Desantis v.Soller (1990), 70 Ohio App.3d 226, 233. The 1970 Staff Note to Civ.R. 53 states, "Rule 53 contemplates that a [magistrate]shall aid the court in the expedition of the court's business and not be a substitute for the functions of the court." (Emphasis added.) Congruently, Juv.R. 40(E)(4)(a) provides that any magistrate's decision becomes effective only when and if "adopted by the court and noted in the journal record."
 {¶ 36} These fundamental rules make it clear that magistrate's decisions, though file-stamped and mailed to all parties, have no adjudicative force or effect, regardless of the findings or conclusions contained therein, unless and until the court adopts them.[3] Accordingly, any magistrate's decision rendered in John Roe's juvenile delinquency proceedings had absolutely no effect whatsoever, even if it contained recommendations regarding John Roe's ultimate level of culpability for the counts with which he was originally charged.
 {¶ 37} Heap also wrote that John Roe's "conviction" was for "sexual crimes." But juvenile delinquency proceedings are markedly different in character than adult criminal proceedings, and do not contemplate juveniles retaining a criminal record. InIn re Caldwell (1996), 76 Ohio St.3d 156, the Supreme Court of Ohio clarified the purposes and goals underlying the juvenile court system:
* * * [T]o provide for the care, protection, and mental and physical development of children, to protect the public from the wrongful acts committed by juvenile delinquents, and to rehabilitate errant children and bring them back to productive citizenship, or, as the statute states, to supervise, care for and rehabilitate those children. * * *
Id. at 157, citing R.C. 2151.01.
 {¶ 38} The court in Caldwell also observed, "[p]unishment is not the goal of the juvenile system, except as necessary to direct the child toward the goal of rehabilitation." Id. This goal has long informed decisions of the Supreme Court of Ohio on the issue of the subsequent treatment juvenile delinquency adjudications are to be given. In Cope v. Campbell (1964),175 Ohio St. 475, the court stated, "[p]roceedings in a Juvenile Court are civil in nature and not criminal. The appellant was not prosecuted for a criminal offense. The appellant was never indicted, never convicted and never sentenced." Id. at 477. InIn re Agler (1969), 19 Ohio St.2d 70, the court stated, "[a] child is not a criminal by reason of any Juvenile Court adjudication, and civil disabilities ordinarily following conviction do not attach." Id. at 73.
 {¶ 39} "[A] juvenile adjudicatory hearing is not at allsimilar to a criminal trial. In those hearings, juveniles are asked to admit or deny the allegations; they are not asked to enter pleas of guilty or not guilty." In re Kirby,101 Ohio St.3d 312, 2004-Ohio-970, ¶ 21. (Emphasis added.) A "specialized vocabulary" has developed for use in juvenile proceedings, as distinguished from that used in adult criminal proceedings. Inre Anderson (2001), 92 Ohio St.3d 63, 65. As juvenile courts emerged:
"Criminal complaints" gave way to "delinquency petitions." Instead of "trials," "hearings" were held. Juveniles were not given "sentences"; they received "dispositions." Juveniles were not "found guilty"; they were "adjudicated delinquent."
Id. "[T]he basic philosophy of the juvenile system * * * [is] that juveniles are not criminals." Id. at 66, fn 2. (Emphasis added.)
 {¶ 40} The Tenth Appellate District has likewise consistently recognized that an act that would be considered a crime if committed by an adult is not a crime when committed by a juvenile. See, e.g., State v. Hale (1969), 21 Ohio App.2d 207,212 ("Juvenile delinquency is not considered a crime in Ohio.");State v. Weeks (1987), 37 Ohio App.3d 65; In re Skeens (Feb. 25, 1982), Franklin App. No. 81AP-882 ("Evidence that the minor committed acts that would constitute a crime if committed by an adult is used only for the purpose of establishing that the minor is delinquent, not to convict him of a crime and to subject him to punishment for that crime."); Roe v. Franklin Cty. (1996),109 Ohio App.3d 772, 783 ("[I]t is well settled that a juvenile court proceeding is not criminal in nature.")
 {¶ 41} Many of these holdings were based upon the language contained in various versions of what is now R.C. 2151.358, which provides, in pertinent part:
The judgment rendered by the court under this chapter shall not impose any of the civil disabilities ordinarily imposed by conviction of a crime in that the child is not a criminal byreason of the adjudication and no child shall be charged with or convicted of a crime in any court except as provided by this chapter.
R.C. 2151.358(H). (Emphasis added.) This language has remained, virtually unchanged, since the time of this statute's enactment in 1937 (117 Ohio Laws, 520, 530). Beatty v. Riegel (1961),115 Ohio App. 448, 451. The overwhelming and consistent authority in Ohio courts compels the conclusion that John Roe cannot ever have been said to have been "convicted" of a "crime" at, or after, any stage of the juvenile delinquency proceedings in which he was involved.
 {¶ 42} Finally, we note that it is undisputed that the juvenile court in John Roe's case has never adjudicated him delinquent based on any finding as to an assault of a sexual nature. The original delinquency charges were amended to one charge of disorderly conduct, and the court dismissed the petition and ordered the record expunged.
 {¶ 43} In the present case, given the character and purposes of Ohio's juvenile justice system, the fact that a magistrate's recommendation in no way approximates a judgment, and the fact that John Roe has never been adjudicated delinquent of any sex offense in the juvenile court, the trial court abused its discretion when it found that Heap's statements that John Roe is "a convicted sexual offender" were substantially true.
 {¶ 44} To say that, as of February 18, 2002, John Roe was a "convicted sexual offender" inflicts a "sting" and conveys a "gist" substantially more injurious than would accompany a statement describing what had actually occurred in John Roe's juvenile delinquency case by that date. The trial court thus abused its discretion when it found Heap was entitled to judgment as a matter of law on appellant's defamation claim based on the substantial truth of Heap's statements. Accordingly, we sustain appellant's first assignment of error with respect to appellant's claim of defamation against Heap.
Innocent Construction Rule
 {¶ 45} The court of common pleas also abused its discretion in applying the "innocent construction" rule to Heap's allegedly defamatory statements. According to the rule, if allegedly defamatory words are susceptible of two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted. Yeager v. Local Union 20 (1983),6 Ohio St.3d 369, 372.
 {¶ 46} "The rule protects only those statements that arereasonably susceptible of an innocent construction." McKimm v.Ohio Elections Comm. (2000), 89 Ohio St.3d 139, 146. (Emphasis sic.) "To construe a [statement] in an unreasonable manner in order to give it an innocent interpretation is itself incompatible with the rule's requirement that the words be given their `natural and obvious meaning.'" 8 Speiser, Krause Gans, The American Law of Torts (1991) 436, Section 29:39.
 {¶ 47} We cannot find an innocent construction to Heap's statements that John Roe is a "convicted sexual offender" and has been "convicted of sexual crimes." "A classic example of a statement with a well-defined meaning is an accusation of crime."Ollman v. Evans (C.A.D.C. 1984), 750 F.2d 970, 980. Ohio courts have consistently held that false accusations of criminal activity (even those that do not allege that the subject has been convicted) are clearly defamatory per se. See, e.g., Mallory v.Ohio Univ. (Dec. 20, 2001), Franklin App. No. 01AP-278;McCartney v. Oblates of St. Francis deSales (1992),80 Ohio App.3d 345; Gilbert v. WTOU Touch 1350 (May 9, 2001),142 Ohio App.3d 725; Celebrezze v. Netzley (Aug. 4, 1988), Cuyahoga App. No. 53864.
 {¶ 48} The trial court improperly granted judgment as a matter of law in favor of Heap on appellant's claim for defamation based on the "innocent construction rule." Accordingly, we sustain appellant's fourth assignment of error.
 INVASION OF PRIVACY {¶ 49} In his first and second assignments of error, appellant argues the trial court abused its discretion in granting summary judgment on his invasion of privacy claims against Heap and Scheibeck, respectively.
 {¶ 50} In Housh v. Peth (1956), 165 Ohio St. 35, the Supreme Court of Ohio first recognized the tort of invasion of privacy, and described the principle of the right of privacy in Ohio as follows:
1. The right of privacy is the right of a person to be let alone, to be free from unwarranted publicity, and to live without unwarranted interference by the public in matters with which the public is not necessarily concerned.
2. An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.
Id. at paragraphs one and two of the syllabus. See, also,Sustin v. Fee (1982), 69 Ohio St.2d 143.
 {¶ 51} The trial court evaluated appellant's claims based upon the latter two of the three bases noted in the second paragraph of the Housh syllabus; that is, the "publicity" and "wrongful intrusion" types of invasion of privacy.
 {¶ 52} Essentially, the true facts that appellees' e-mails publicized were that John Roe was involved in a judicial proceeding within which he had been accused of perpetrating an offense of a sexual nature upon another person. It is with this in mind that we analyze the propriety of the trial court's grant of summary judgment to appellees on appellant's invasion of privacy claims.
1. Publicity Tort
 {¶ 53} To recover for "publicity" invasion of privacy, the following elements must ultimately be shown: (1) that there has been a public disclosure; (2) that the disclosure was of facts concerning the private life of an individual; (3) that the matter disclosed would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) that the disclosure was intentional; and (5) that the matter publicized is not of legitimate concern to the public. Killilea v. Sears,Roebuck Co. (1985), 27 Ohio App.3d 163, 166-167; Early v. TheToledo Blade (1998), 130 Ohio App.3d 302, 342; Strutner v.Dispatch Printing Co. (1982), 2 Ohio App.3d 377, 378. The publication must concern a truly private fact, not something that the plaintiff himself has already made public by, e.g., filing a civil lawsuit. Pollock v. Rashid (1996), 117 Ohio App.3d 361,369.
Public Disclosure
 {¶ 54} In granting summary judgment on appellant's claim for a publicity tort, the trial court found that appellees' e-mails were not a "public disclosure" because they were sent to only a small group of people. The trial court also found that appellees' e-mails contained facts that involved a matter of legitimate concern to the public. Finally, the court found that the facts published by Heap and Scheibeck were public, not private facts. On appeal, appellant challenges each of these findings.
 {¶ 55} In finding that no public disclosure occurred in the present case, the trial court relied on the case of Roberts v.Hagen (Feb. 9, 2000), Medina App. No. 2845-M. In Roberts, the plaintiff's claim for invasion of privacy was based on the defendant employer having disclosed to the plaintiff's co-worker negative comments the plaintiff had made about the co-worker. The court held that the invasion of privacy claim could not be maintained when the disclosure was made to only one or even a small group of people. Relying on Roberts, the trial court in the present case found that because appellees' e-mails were sent to so few individuals, there had been no public disclosure.
 {¶ 56} The Roberts court relied exclusively on Restatement of the Law 2d, Torts (1977) 384, Section 652D, Comment a, which explains, in pertinent part:
"Publicity," * * * means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. * * * [Publicity is] communication that reaches, or is sure to reach, the public.
 {¶ 57} A fair reading of Roberts reveals that its holding was based less upon the number of direct recipients of the disclosure, and more upon the fact that there was apparently no evidence before the court that the subject matter of the disclosure was substantially certain to become public knowledge. Thus, in determining whether appellees' e-mails were public disclosures, the character of the communications, and the likelihood that they would become public knowledge, wield more persuasive force than the number of persons to whom the disclosures were initially made.
 {¶ 58} With this in mind, we find no abuse of discretion in the trial court's finding that appellees' e-mail messages, sent to a handful of USD officials, were not public disclosures. Appellees' messages were directed specifically to officials involved in a national organization of which appellees' daughters' diving club was a member. The messages sought, inter alia, clarification and modification of USD's policies respecting protection of minor children during sponsored events, and were disseminated only to persons presumably possessing some measure of authority and influence over such policies. Moreover, there is no evidence in the record that the content of appellees' e-mail messages were substantially certain to become public knowledge. As such, the messages were private communications, not public.
 {¶ 59} Appellant argues that Heap's message constitutes a "public disclosure" because she encouraged the recipients to inform "every single parent" of a child involved in USD, and that Scheibeck's message was a public disclosure because she requested that the recipients forward the information contained therein to the owner of the Indianapolis Starz Diving Club. However, there is no evidence of record to demonstrate that any USD official informed any other person about the allegations concerning John Roe contained in either e-mail message.
 {¶ 60} Appellant also argues that Heap made a public disclosure in discussing John Roe with several of her friends, and Scheibeck did so in sending an e-mail message regarding John Roe to a central Ohio diving coach. Again, however, there is no evidence that the subject matter of these communications was "substantially certain to become one of public knowledge" as a result of the communications. Accordingly, the trial court did not abuse its discretion in finding that no "public disclosure" occurred such as would satisfy the first Killilea element of a claim for "publicity" invasion of privacy.
Legitimate Public Interest
 {¶ 61} In the present case, the trial court found that, "U.S. Diving had a legitimate interest as to the Magistrate's hearing on the charges against John Roe" because John Roe and appellees' daughters were members of a USD-affiliated organization at the time of the alleged incident, the incident occurred at an event involving USD members, and appellees' e-mail messages were sent to USD officials. In other words, the trial court found that the e-mail messages were protected by a qualified privilege. (Indeed, the trial court specifically states that a qualified privilege protects appellees' communications.)
 {¶ 62} The defense of qualified privilege was set forth by the Supreme Court of Ohio in Hahn v. Kotten (1975),43 Ohio St.2d 237, a case involving a claim for defamation. Therein, the court stated:
As Prosser states in his Law of Torts (4 Ed.) 786, Section 115: "* * * It is difficult to reduce the cases to any single statement, and perhaps no better formula can be offered than that of Baron Parke that the publication is privileged when it is `fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'" * * *
As stated in 50 American Jurisprudence 2d 698, Libel and Slander, Section 195:
"Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actualmalice essential to the right of recovery.
"A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. The essential elements thereof are goodfaith, an interest to be upheld, a statement limited in its scopeto this purpose, a proper occasion, and publication in a propermanner and to proper parties only." (Emphasis added.)
Id. at 243-244. (Footnote omitted.)
 {¶ 63} The Second Appellate District extended the application of the qualified privilege to a publicity tort claim in Knechtv. Vandalia Med. Center (1984), 14 Ohio App.3d 129, 131, and did so again in Shepard v. Griffin Services, Inc., 2nd Dist. No. 19032, 2002-Ohio-2283. The Supreme Court of Ohio has not expressly dealt with the issue whether the Hahn qualified privilege defense may be extended to causes of action for invasion of privacy. The trial court herein, however, has applied the qualified privilege to appellant's publicity tort claim. In so doing, the trial court relied on the Second Appellate District's opinion in Shepard, supra. The instant appeal has thus placed before us the question whether such an application of the qualified privilege defense will be permitted in the Tenth Appellate District.[4]
 {¶ 64} The Eighth Appellate District has held that the privileges available in an action for defamation are also available in an action for invasion of privacy. Chambers v.Terex (Mar. 31, 1983), Cuyahoga App. No. 45377. The Chambers
court, however, also held that malice is not an element of the tort of invasion of privacy. We agree with the holding ofChambers, and, in keeping with our own precedent regarding the elements of claims for invasions of privacy, we hold that malice is not an element of a cause of action for invasion of privacy. Pursuant to Hahn, supra, the qualified privilege exists in order to aid in rebutting the inference of malice. Thus, because malice is not an element of the plaintiff's prima facie case in an action for invasion of privacy, the defense of qualified privilege is not necessary or available in such an action. Accordingly, the trial court erred in applying the defense of qualified privilege to appellees' communications subject of appellant's claim for invasion of privacy.
 {¶ 65} However, the applicable case law and the motions for summary judgment filed by appellees nevertheless required that the trial court determine whether appellees' communications concerned matters of legitimate interest to the public. In the case of Cox Broadcasting Co. v. Cohn (1975) 420 U.S. 469,95 S.Ct. 1029, the United States Supreme Court indicated that an action for invasion of privacy cannot be maintained when the subject matter of the publicity is a matter of "legitimate concern to the public." See, also, Connick v. Myers (1983),461 U.S. 138, 143, 103 S.Ct. 1684, fn. 5; Killilea v. Sears, Roebuck Co. (1985), 27 Ohio App.3d 163.
 {¶ 66} On appeal, appellant argues that USD did not have a legitimate interest in the information. Heap argues that USD takes a keen interest in the conduct of its members, and thus has a legitimate interest in any misconduct involving athletes associated with its member organizations. She relies for support of this contention, as she did in her motion for summary judgment, on Article 70, Section 470.1 of the USD Code of Regulations ("USD Code").[5]
 {¶ 67} Heap points out that Article 70, Section 470.1 of the USD Code provides for censure, suspension or expulsion of any member, including any participating athlete who has "acted in a manner which brings disrepute upon [USD]." Heap argues that the USD Code evidences that USD has taken a genuine interest in the conduct of athletes such as John Roe, and that such an interest is legitimate "given its responsibility to oversee safe and sportsmanlike events for its members, especially its junior members."[6]
 {¶ 68} Appellant points out that the USD Code also provides that, except for certain specific situations not implicated herein, disciplinary proceedings will originate in the "Local Diving Committee (LDC or Association)."[7] Further, the USD Code provides that all decisions of the LDC will be final, subject only to a timely appeal to the National Board of Review.[8] Thus, appellant argues, though John Roe's delinquency proceedings might be of legitimate concern to John Roe's LDC, they are not of legitimate concern to USD unless and until the LDC institutes disciplinary proceedings against John Roe and the same come before the National Board of Review on appeal. [9]
 {¶ 69} We find appellant's position persuasive. In the present case, the information contained in appellees' e-mail messages was not of legitimate concern to USD, since USD has conferred upon itself original jurisdiction in disciplinary matters only in certain situations not applicable in the present case. More plainly, there was nothing that USD could do with the information contained in appellees' e-mail messages until the matter was brought within its jurisdiction upon an appeal from an adverse action taken by John Roe's LDC.
 {¶ 70} This reality was cogently explained to Heap by William L. Farrar, Jr., USD's general counsel, in a letter dated March 14, 2002, a copy of which was attached to Heap's motion for summary judgment as Exhibit "C." Therein, attorney Farrar stated:
United States Diving, Inc. (USD) is the National Governing Body (NGB) for the Olympic Sport of Diving in the United States. USD is governed by its Code of Regulations (USD Code). As a NGB for an Olympic sport, USD also is governed by the provisions of the USOC Constitution and By-Laws. Finally, because the athlete involved is an amateur, actions involving an athlete's right to compete are governed by federal law known as the Amateur Sports Act of 1978, as amended, 36 U.S.C. § 220501 et seq. (the Amateur Sports Act). Each of these authorities safeguard an athlete's right to compete.
Because an athlete's right to compete is valued so highly, strict legal requirements govern proceedings for the denial of the right to compete. USD's procedures are contained in Articles 70 and 71 of the USD Code. No USD officer or even its Board of Directors may summarily prevent an athlete from competing.
At this time USD is aware that a claim has been submitted, as required by Article 70, to the Local Diving Association (Ohio Diving Association) to deny [John Roe] his right to compete. Until such time as the procedural requirements of Article 70 are completed, USD as a NGB may not further address [John Roe's] eligibility as a competitor.
(Emphasis sic.)
 {¶ 71} In light of all of the foregoing, we conclude that the matters subject of appellees' e-mail messages were not of legitimate concern to USD. Accordingly, in granting summary judgment to appellees, the trial court erred when it found that this information was of legitimate concern to USD.
Private Facts
 {¶ 72} In granting summary judgment to appellees on appellant's claim for publicity invasion of privacy, the trial court also found that the delinquency proceedings against John Roe were open to the public before appellees sent their e-mail messages, and thus, facts regarding the proceedings are not "private facts" for purposes of the second element underKillilea, supra. Appellant argues that juvenile court proceedings are not public in nature, and the particular proceedings involving John Roe were not attended by any members of the general public; thus, appellant argues, John Roe's juvenile court proceedings involve private — not public — matters.
 {¶ 73} Heap[10] argues that Ohio juvenile court proceedings are presumptively open to the public unless specifically closed by an order of the juvenile court, upon motion. Thus, according to Heap, since John Roe's juvenile court proceedings were not specifically closed by the juvenile court, such proceedings are public — not private — matters. Heap argues that, "[p]ublic information cannot form the basis for an invasion of privacy claim."[11]
 {¶ 74} The issue has thus been framed as the question whether facts concerning John Roe's juvenile delinquency proceedings were public information by virtue of being part of a court record, and cannot, therefore, form the basis of a publicity tort claim for subsequent disclosure thereof.[12]
 {¶ 75} Comment b to Section 652D of the Restatement 2d of Torts, is instructive on this issue. It states:
There is no liability [for the publicity type of invasion of privacy] when the defendant merely gives further publicity to information about the plaintiff that is already public. Thus there is no liability for giving publicity to facts about the plaintiff's life that are matters of public record, such as the date of his birth, the fact of his marriage, his military record, the fact that he is admitted to the practice of medicine or is licensed to drive a taxicab, or the pleadings that he has filed in a lawsuit. On the other hand, if the record is one not open to public inspection, as in the case of income tax returns, it is not public, and there is an invasion of privacy when it is made so.
Restatement of the Law 2d, Torts (1977) 385, Section 652D, Comment b.
 {¶ 76} Juv.R. 37(A) requires that the juvenile court make a record of all adjudicatory and dispositional proceedings in delinquency cases. Thus, immediately upon the institution of the delinquency proceedings involving John Roe, information regarding same was kept by the juvenile court, and, in a limited sense, became a "public record." But these records are not available for public inspection in the manner in which records of other Ohio courts are available.
 {¶ 77} Juv.R. 37(B) provides:
No public use shall be made by any person, including a party, of any juvenile court record, including the recording or a transcript of any juvenile court hearing, except in the course of an appeal or as authorized by order of the court or by statute.
The Staff Note to the July 1, 2001 amendment to this paragraph of the rule states, "[t]he amendment was not intended to designate juvenile court records as public documents or to enlarge access to juvenile records beyond that specifically designated by a statute directed at juvenile court records." Moreover, juvenile court records are not public records under Ohio's Public Records Act. 1990 Ohio Atty. Gen. Ops. No. 90-101, paragraph eight of the syllabus.
 {¶ 78} Accordingly, Ohio juvenile court records, including those concerning John Roe, are not open to public inspection. Id. They are "public" records in the sense that they are kept, maintained and utilized by a governmental entity, yet they are shielded from inspection by the general public; thus, they are much more akin to the income tax returns discussed in Commentb, supra, than to records maintained by other types of state courts.
 {¶ 79} We hold that because records of juvenile court proceedings in Ohio are not open to public inspection, the information contained therein is not presumptively "public" for purposes of a publicity tort claim brought against a non-governmental, non-media defendant.[13] See Restatement of the Law 2d, Torts (1977) 385, Section 652D, Comment b,
supra. Thus, the mere fact that a juvenile delinquency proceeding and information regarding the nature of the charges involved therein is contained in a file maintained by a juvenile court, does not mean that such information is, ipso facto, public information. This is true regardless whether the court closes the courtroom for any particular stage of the proceeding. A non-governmental, non-media defendant who publicizes facts regarding the existence and substance of a juvenile delinquency proceeding cannot escape liability for invasion of privacy simply by asserting that he or she has merely given further publicity to matters already a matter of public record. For this reason, the court of common pleas abused its discretion when it held that the facts that appellees publicized were public facts by sole virtue of the fact that the Franklin County Juvenile Court did not close the hearings that occurred in John Roe's delinquency proceedings.
 {¶ 80} However, because we have determined that the trial court did not abuse its discretion in finding that appellant cannot show that a public disclosure occurred; his publicity tort claims must fail. Accordingly, appellant's first and second assignments of error are overruled with respect to those claims.
2. Wrongful Intrusion Tort
 {¶ 81} The trial court also granted summary judgment to appellees with respect to the "wrongful intrusion" type of invasion of privacy. This type of invasion of privacy is "the wrongful intrusion into one's private activities * * * in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Haller v.Phillips (1990), 69 Ohio App.3d 574, 578. "The `intrusion' tort is not dependent upon publicity of private matters, but is akin to trespass in that it involves intrusion or prying into the plaintiff's private affairs." Killilea v. Sears, Roebuck Co.
(1985), 27 Ohio App.3d 163, 166. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement of the Law 2d, Torts (1977) 378, Section 652B.
 {¶ 82} The intrusion must be wrongful, as well as done in a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. Strutner v.Dispatch Printing Co. (1982), 2 Ohio App.3d 377, 378. "`Wrongful' does not require that the intrusion itself be wrongful in the sense that there is no right to make any intrusion. Rather, `wrongful' may relate to the manner of the making of the intrusion * * *." Id. at 378-379. The intrusion must be of such a character as would shock the ordinary person to the point of emotional distress. Haller, supra, at 578. Thus, the standard is similar to that applicable to claims of intentional infliction of emotional distress. Ibid.
 {¶ 83} In granting summary judgment on appellant's claim for wrongful intrusion, the trial court found that appellant had not presented evidence of emotional distress sufficient to support his claim. The trial court characterized appellant's affidavit as making "conclusory allegations of outrageous conduct and severe emotional harm which are insufficient as a matter of law to withstand summary judgment."[14]
 {¶ 84} Upon review of Heap's motion for summary judgment, however, we note that the same failed to meet the initial burden under Civ.R. 56(C) and Dresher v. Burt (1996),75 Ohio St.3d 280, with respect to the absence of a genuine factual dispute regarding any element of the wrongful intrusion tort. Heap's motion was directed toward obtaining summary judgment on the publicity tort claim and does not address the wrongful intrusion claim at all. As such, the trial court abused its discretion in granting Heap judgment as a matter of law on appellant's wrongful intrusion claim against her.
 {¶ 85} Scheibeck did address the wrongful intrusion claim. She argued that any alleged intrusion was not an intrusion into private activities. Her entire argument was comprised of the following two sentences: "In this case the alleged private facts were part of a public hearing. They were in the `public eye' and therefore as a matter of law cannot be the basis of a cause of action under the `Private Intrusion' tort."[15] Because Scheibeck did not discharge her initial burden to demonstrate that appellant could not prove that John Roe suffered emotional distress as a result of the alleged intrusion, the trial court should never have reached consideration of any affidavit offered by appellant in support of this fact. The trial court erroneously conducted the burden shifting required by Civ.R. 56, and erred in finding that Scheibeck was entitled to summary judgment on the wrongful intrusion claim based on lack of evidence that John Roe suffered emotional distress.
 {¶ 86} Scheibeck, did, however, sufficiently raise an argument regarding whether the alleged intrusion invaded John Roe's private seclusion. In meeting his reciprocal burden on this issue in his memorandum contra, appellant reiterated his arguments advanced in resisting summary judgment as to his publicity tort claim. He argued that juvenile court proceedings are not public in nature, but are private matters. Scheibeck filed no memorandum in reply.
 {¶ 87} In many cases, including this one, the analysis of whether the matters allegedly intruded upon were private or public, for purposes of a wrongful intrusion claim, is not identical to the analysis of whether the facts allegedly publicized involved private matters for purposes of a publicity tort claim arising out of the same conduct. As we noted earlier, with respect to appellant's publicity tort claim, the parties framed the issue very narrowly by focusing on whether the intrinsic nature of juvenile court proceedings is such that appellees' revelations regarding John Roe's juvenile proceedings amounted to no more than the giving of further publicity to matters that were already "public," as that defense is delineated in the Restatement of the Law 2d, Torts (1977) 385, Section 652D, Comment b.
 {¶ 88} With respect to appellant's wrongful intrusion claim, the inquiry is not whether, for all intents and purposes, publicity had already been given to the facts before Scheibeck publicized them; the inquiry is whether Scheibeck perpetrated any intrusion, and if so, whether it was directed at matters so private that the intrusion amounted to a trespass. SeeKillilea, supra, at 166.
 {¶ 89} The Restatement is helpful in understanding the difference between the publicity tort and the intrusion tort:
The form of invasion of privacy covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.
Restatement of the Law 2d, Torts (1977) 378, Section 652B, Comment a. Comment b to that section goes on to explain, "[t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined." Id. at Comment b.
 {¶ 90} In the absence of a physical intrusion into a place in which the plaintiff has secluded himself, liability for wrongful intrusion will attach where the defendant has undertaken:
* * * [S]ome other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. * * *
Id.
 {¶ 91} We do not perceive any facts in the record demonstrating that Scheibeck's actions in communicating certain allegations about John Roe constitute an intrusion or a prying into matters contained within John Roe's sphere of personal seclusion, so as to constitute a trespass that would be highly offensive to a reasonable person. "It was not the purpose of the [Supreme] court, in recognizing the right of privacy in Ohio [inHoush v. Peth, supra], to extend it to all cases in which a person may be subjected to unwanted notoriety." Kane v. Quigley
(1964), 1 Ohio St.2d 1, 3-4. The facts of the present case demonstrate that Scheibeck decidedly did subject John Roe to unwanted notoriety, but her actions did not, as a matter of law, constitute a trespass upon an area that he had cloaked with the aura of personal seclusion.
 {¶ 92} Accordingly, the trial court did not abuse its discretion in granting summary judgment to Scheibeck on appellant's wrongful intrusion claim. Appellant's second assignment of error is overruled with respect to his wrongful intrusion claim against Scheibeck. As noted earlier, Heap did not direct her motion for summary judgment toward appellant's wrongful intrusion claim; thus, the trial court erred in granting same, and we sustain appellant's first assignment of error with respect to this claim.
3. False Light
 {¶ 93} In his fifth assignment of error, appellant argues the trial court erred in failing to recognize the tort of "false light" invasion of privacy. Ohio courts have yet to recognize this as a viable theory of recovery. Appellant concedes this, but argues that the instant case presents appropriate facts for recognition of the tort.
 {¶ 94} We agree that this case presents facts that merit a rigorous examination of the false light theory. As discussed infra, we also believe that such an examination is a worthwhile endeavor for a court of intermediate appellate review, because the Supreme Court of Ohio has not yet, in our view, forever foreclosed the possibility that it may one day choose to recognize the tort. However, for a number of reasons, discussed infra, we are not persuaded that prudence counsels recognition of the tort.
 {¶ 95} "False light" is a theory that emerged as a distinct branch of the invasion of privacy tort in an article by Dean Prosser in 1960. See Prosser, Privacy, 48 Calif. L. Rev. 383 (1960). Dean Prosser used the phrase "false light in the public eye" to characterize invasion of privacy cases that did not fit into other recognized categories of the tort. The false light doctrine has since been included in the Restatement of Torts definition of invasion of privacy. See Restatement of the Law 2d, Torts (1977) Sections 652A(2)(d) and 652E.
 {¶ 96} Section 652E of the Restatement outlines the tort as follows:
One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
Restatement of the Law 2d, Torts (1977), 394, Section 652E.
 {¶ 97} The false light invasion of privacy has also been characterized as an offshoot from the law of defamation, applicable in cases where false information has been published to the damage of the plaintiff but which is not actionable as libel or slander. Strutner v. Dispatch Printing Co. (1982),2 Ohio App.3d 377, 380. A false light invasion differs from other invasions of privacy in that truth is not a defense to actions predicated upon other types of invasions. As with defamation, a false light invasion is predicated upon publication of false information about another, which places him in a false light before the public. Thus, truth is a defense to an action for false light invasion of privacy. The falseness of the information and the intentional or reckless manner in which it is published — rather than the intrusion into one's privacy — is the gravamen of the false light invasion action. Ibid.
 {¶ 98} The theories of defamation and false light invasion of privacy can provide two distinct, alternative remedies for the same harm, or, in some cases, the false light invasion of privacy theory can provide a means of recovery for the plaintiff even when he has not been defamed. The relationship between the two theories is explained thusly by the American Law Institute:
The interest protected by this Section is the interest of the individual in not being made to appear before the public in an objectionable false light or false position, or in other words, otherwise than as he is. In many cases to which the rule stated here applies, the publicity given to the plaintiff is defamatory, so that he would have an action for libel or slander under the rules stated in Chapter 24. In such a case the action for invasion of privacy will afford an alternative or additional remedy, and the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity.
It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position. When this is the case and the matter attributed to the plaintiff is not defamatory, the rule here stated affords a different remedy, not available in an action for defamation.
Restatement of the Law 2d, Torts (1977) 395, Section 652E, Comment b.
 {¶ 99} False light invasion of privacy only occurs when the false light in which the defendant has placed the plaintiff is of a kind that would be highly offensive to a reasonable person. Id. at 396, Comment c. "In other words, it applies only when the defendant knows that the plaintiff, as a reasonable [person], would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." Ibid.
The plaintiff's privacy is not invaded when the unimportant false statements are made, even when they are made deliberately. It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [person] in [the plaintiff's] position, that there is a cause of action for invasion of privacy.
Ibid.
 {¶ 100} The Supreme Court of Minnesota has succinctly explained the difference between the two torts as follows:
Defamation requires a false statement communicated to a third party that tends to harm a plaintiff's reputation. False light requires publicity, to a large number of people, of a falsity that places the plaintiff in a light that a reasonable person would find highly offensive. The primary difference between defamation and false light is that defamation addresses harm to reputation in the external world, while false light protects harm to one's inner self.
Lake v. Wal-Mart Stores, Inc. (1998), 582 N.W.2d 231, 235.
 {¶ 101} To date, the Supreme Court of Ohio has not recognized a cause of action for false light invasion of privacy. In Houshv. Peth (1956), 165 Ohio St. 35, the court recognized the publicity, wrongful intrusion and unwarranted appropriation types of invasion of privacy, but was silent with respect to the false light type. Id. at paragraph two of the syllabus. In Sustin v.Fee (1982), 69 Ohio St.2d 143, the court quoted Section 652A of the Restatement 2d, of Torts, including all four types of invasion of privacy set forth therein, which includes false light invasion. However, the facts in Sustin did not implicate a cause of action for false light invasion; therefore, the court was not called upon in Sustin to adopt or reject the same.
 {¶ 102} Likewise, in Yeager v. Local Union 20 (1983),6 Ohio St.3d 369, the plaintiff, the chief management-side collective bargaining representative for a local employer, was threatened, menaced and picketed at his workplace by members of a local Teamsters affiliate and individuals representing the local chapter of a national organization of dissident Teamsters. Among other acts, the defendants were alleged to have used picket signs and handbills describing the plaintiff as a "Little Hitler," accusing him of operating a "Nazi concentration camp" at the company, alleging that he did not support the United States Constitution, and accusing him of using "Gestapo" tactics and cheating employees. The plaintiff sought recovery under several theories, including false light invasion of privacy.
 {¶ 103} In declining to recognize the theory, the Yeager
court stated:
Under the facts of the instant case, we find no rationale which compels us to adopt the "false light" theory of recovery in Ohio at this time. As stated before, it is our view that the complained about language constitutes expressions of opinions, not facts.
Id. at 372. The facts in Yeager would not have supported an action for false light invasion of privacy because the allegedly tortious communications subject of that action were, in the court's estimation, opinions expressed as part of hyperbolic rhetoric, and thus were not susceptible to assessment as their truth or falsity. Therefore, it would have been inappropriate and unnecessary for the court to use that case as a vehicle for adoption or rejection of the tort of false light invasion of privacy.
 {¶ 104} The high court's most recent declination of the invitation to adopt the false light theory came in its opinion in the case of M.J. DiCorpo, Inc. v. Sweeney (1994),69 Ohio St.3d 497. In that case, the defendant sent an affidavit to the local prosecuting attorney in which he accused one of the plaintiffs of embezzling funds. Thereafter, a local newspaper obtained a copy of the affidavit and published an article detailing the allegations made therein. The plaintiffs claimed the statements made in the affidavit constituted a false light invasion of privacy. The court held that submitting information to a prosecuting attorney regarding a possible or actual crime constitutes actions taken in the course of a judicial proceeding, and the informant is thus entitled to an absolute privilege against all civil liability for any statements made that bear a reasonable relation to the activity reported. Thus, the court held that the defendant was entitled to summary judgment as to all recognized claims arising out of the statements made in his affidavit.
 {¶ 105} Because the court held that an absolute privilege applied to wholly protect the allegedly tortious conduct, it again declined to recognize false light invasion of privacy, noting that, "this case (like Yeager) is obviously not the appropriate case to consider adopting, or rejecting, the false light theory of recovery." Id. at 507.
 {¶ 106} This court has likewise historically declined to recognize false light invasion of privacy. In several cases we explained that the facts did not compel such a recognition because the statements forming the basis for the alleged invasion of privacy were either true or were constitutionally protected statements of opinion not susceptible of a determination as to their truth or falsity. See Mushkat v. Pickawillany CondominiumUnit Owners' Assoc. (Apr. 14, 1981), Franklin App. No. 80AP-765;Strutner v. Dispatch Printing Co. (1982), 2 Ohio App.3d 377;Ohio Savings Assoc. v. Business First of Columbus, Inc. (1988),43 Ohio App.3d 215; Huntington Ctr. Associates v. Schwartz,Warren Ramirez (Sept. 26, 2000), Franklin App. No. 00AP-35.
 {¶ 107} This court has also declined to recognize the false light theory of invasion of privacy when the statements subject of the plaintiff's claims were not wrongful, but were made by one who we determined had "a right, if not a duty" to make the statements. Without "wrongful" statements, there could be no invasion of privacy in any case. See Nichols v. Dept. of MentalRetardation (June 29, 1982), Franklin App. No. 82AP-163. See, also, Grange Mutual Cas. Co. v. Klatt (Mar. 18, 1997), Franklin App. No. 96APE07-1125, in which we declined to recognize the false light tort when the claim was based upon a party issuing service of summons to the other at addresses that were not the address of that party.
 {¶ 108} In several other cases, this court has declined to adopt the theory either without explanation, or with an observation that the Supreme Court of Ohio has not yet adopted the same. See Killilea v. Sears, Roebuck Co. (1985),27 Ohio App.3d 163; Wheeler v. Yocum (Mar. 25, 1986), Franklin App. No. 85AP-828; Sullivan v. Tucci (1990), 69 Ohio App.3d 20.
 {¶ 109} In Celebrezze v. Dayton Newspapers, Inc. (1988),41 Ohio App.3d 343, the Eighth Appellate District also declined to recognize the false light tort, finding, as the trial court had, that the facts were parallel to those in Yeager, and, as such, did not support discussion of the tort. However, the Eighth District noted that the "qualifying terms" with which the Supreme Court of Ohio had declined to adopt the theory in Yeager
suggested that, "the Supreme Court has [not] yet spoken with such finality as to forever foreclose a false light cause of action in Ohio." Id. at 345. The court of appeals went on to observe that, implicit in Yeager and two appellate court opinions (including this court's opinion in Wheeler, supra), is the notion that a case presenting appropriate facts might compel the recognition of the false light theory of invasion of privacy by an Ohio intermediate appellate court. Id.[16]
 {¶ 110} Appellant herein urges that the present case is an appropriate one in which to recognize the false light theory of invasion of privacy. He argues that, unlike prior decisions in which Ohio courts have declined to recognize the tort, the communications subject of appellant's claims were not statements of opinion, but were false statements of fact published with knowledge of their falsity, or with reckless disregard for their truth or falsity.
 {¶ 111} Appellant points out that appellees admitted that they never possessed any first-hand knowledge of John Roe's juvenile delinquency proceedings, and although Scheibeck stated she spoke with an assistant prosecuting attorney about the case, she admitted that this could have occurred after she sent her e-mail message to USD. Appellant also appears to argue that a jury could find that the false light into which appellees' communications placed John Roe would be highly offensive to a reasonable person.
 {¶ 112} For so-called "dignitary torts" such as defamation and invasion of privacy, one of the primary purposes of the tort system is to vindicate the injured party and "to obtain a public declaration that the plaintiff is right and was improperly treated." Restatement of the Law 2d, Torts (1977) 453 Section 901, Comment c. Additionally, "the law of torts, which was once scarcely separable from the criminal law, has within it elements of punishment or deterrence." Ibid. That is, the tort system exists, in part, to encourage and discourage certain behaviors. Owing to this deterrent purpose and effect, tort law must be as clear and certain as possible so that it may serve its function in regulating how persons deal with and treat one another.
 {¶ 113} "Both because it substantially overlaps with another tort, defamation, and because it is difficult to quantify, courts and legal scholars heartily debate whether false light invasion of privacy deserves a place among the recognized torts." TheDenver Publishing Co. v. Bueno (2002), 54 P.3d 893, 898. "False light remains the least-recognized and most controversial aspect of invasion of privacy." Cain v. Hearst Corp. (1994),878 S.W.2d 577, 579, citing Bruce W. Sanford, Libel and Privacy Section 11.4.1 at 567 (2d Ed. 1991) ("Of Dean Prosser's four types of privacy torts, the `false light' school has generated the most criticism because of its elusive, amorphous nature.")
 {¶ 114} Indeed, in rejecting the false light tort, many courts in the United States have cited, as their primary reason for doing so, the fact that in the vast majority of cases, the tort of defamation will provide the plaintiff with an appropriate remedy, while recognition of the false light tort will, "unacceptably increase the tension that already exists between free speech constitutional guarantees and tort law." Id. at 579-580.
 {¶ 115} Both defamation and false light seek to remedy false publicity damaging to a plaintiff; the difference in the publicity is that defamation may lie when only one other person has understood the communication and interpreted it in a way which damages the plaintiff's reputation, while the "publicity" required for false light is much broader. The difference in the damage is that defamation requires damage to the plaintiff's reputation, while false light requires only that the publication is highly offensive to a reasonable person, but does not require a showing that it has damaged the plaintiff's reputation. Scholars have thus described the interest protected by the false light tort as "peace of mind," "injury to the inner person," "freedom from scorn and ridicule, freedom from embarrassment, humiliation and harassment, freedom from personal outrage, freedom from injury to feelings, freedom from mental anguish, freedom from contempt and disgrace, and the right to be let alone." Nathan E. Ray, Note, Let There Be False Light: Resisting a Growing Trend Against an Important Tort, 84 Minn. L. Rev. 713, 726. (Citation omitted.)
 {¶ 116} Though the "reasonable person" standard is a widely used test that is generally characterized as objective, within the context of the interests that the false light tort seeks to protect (noted in the preceding paragraphs) we deem this standard too dependent upon individual personal sensibilities, and thus too subjective and amorphous to support the aim of providing predictability respecting which actions the law will and will not punish and for which it will or will not provide redress.
 {¶ 117} The subjective and amorphous nature of the false light tort presents an unnecessary risk of chilling non-defamatory, constitutionally protected free speech.[17]
The risk is unnecessary because false publicity is, in our view, adequately redressed through the law of defamation, and the harm caused by "highly offensive" (or outrageous) behavior is appropriately remedied through the tort of intentional infliction of emotional distress. See Zacchini v. Scripps-HowardBroadcasting Co. (1977), 433 U.S. 562, 97 S.Ct. 2849, wherein the United States Supreme Court noted, "`The interest protected' in permitting recovery for placing the plaintiff in a false light `is clearly that of reputation, with the same overtones of mental distress as in defamation.'" Id. at 573, quoting W. Prosser, Privacy, 48 Calif. L. Rev. 383, 400 (1960).
 {¶ 118} For all of the foregoing reasons, we decline to recognize the tort of false light invasion of privacy. Accordingly, appellant's first and second assignments of error are overruled with respect to his claims for false light invasion of privacy, and his fifth assignment of error is overruled in its entirety.
 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS {¶ 119} Also in appellant's first and second assignments of error, he argues the trial court erred in granting appellees judgment as a matter of law on his claims for intentional infliction of emotional distress ("IIED").
 {¶ 120} To prevail on his claim for IIED, a plaintiff must prove the following four elements: (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community"; (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it." Gudinv. Western Reserve Psychiatric Hosp. (June 14, 2001), Franklin App. No. 00AP-912, citing Pyle v. Pyle (1983),11 Ohio App.3d 31, 34.
 {¶ 121} The Supreme Court of Ohio has relied upon the definition of extreme and outrageous conduct found in the Restatement:
It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by" malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has beenso outrageous in character, and so extreme in degree, as to gobeyond all possible bounds of decency, and to be regarded asatrocious, and utterly intolerable in a civilized community.
Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 374-375, quoting Restatement of the Law 2d, Torts (1965) 71, Section 46(1), Comment d. (Emphasis added.)
 {¶ 122} In granting summary judgment in favor of appellees on appellant's IIED claims, the trial court found that appellees' conduct was not extreme and outrageous and did not go beyond all possible bounds of decency. We agree. The allegations directed toward John Roe and contained in appellees' e-mail messages were of an uncharitable and thoughtless character, to be sure, and were arguably unnecessary to accomplish the purported goals of ensuring the safety of junior competitive divers. But this conduct was not so extreme and outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Accordingly, summary judgment was appropriately granted in favor of appellees on appellant's IIED claim. Appellant's first and second assignments of error are overruled with respect to these claims.
 MOTION FOR PROTECTIVE ORDER {¶ 123} In his third assignment of error, appellant's argument is framed in terms of the trial court's finding that the records of John Roe's juvenile court proceedings were "public in nature." Essentially, though, he argues the trial court erred in conducting an in camera inspection of the juvenile court records, and in releasing portions thereof and denying appellant's motion for a protective order prohibiting such release.
 {¶ 124} Appellant argues the records were irrelevant at the time the trial court conducted its in camera inspection because John Roe's juvenile case had not yet concluded as of that time. Appellant argues that the records should have been kept from appellees for many of the same reasons he cited in support of his first and second assignments of error. He also points out that the juvenile court judge ordered the records in John Roe's case sealed and expunged, pursuant to R.C. 2151.358, in an entry journalized two days prior to the entry releasing portions of the records to appellees. He argues that the entry releasing portions of the records was an impermissible use of expunged records under R.C. 2151.358.
 {¶ 125} Appellant requests a reversal of the trial court's entry releasing the records, a requirement that the records be returned, and a finding that such records may not be utilized by appellees in any later proceeding in this case, including trial.
 {¶ 126} Heap argues, simply, that the trial court was correct to allow her to defend appellant's charges that she made false statements about John Roe's juvenile delinquency proceedings by allowing her to inspect the juvenile court records to determine whether her statements were, indeed, false when made. She also reiterates her earlier argument that juvenile court records are inherently public in nature.
 {¶ 127} In reply, appellant emphasizes that, at the time of the trial court's release of the records, the trial court was unaware that the juvenile court had finally disposed of the case two days earlier. Thus, all the trial court had before it were records evidencing that the juvenile court case had not concluded. Appellant argues that this should have put the trial court on notice that none of the records it had in its possession could or would shed any light on whether appellees' statements that John Roe had been "convicted" were true when made. Thus, appellant urges, it was error for any of the records to have been released.
 {¶ 128} Because the trial court viewed the magistrate's decision in John Roe's juvenile proceedings as akin to a final judgment, it conducted an in camera inspection of the juvenile court file and released the magistrate's decision and documents relevant to it, finding the same "relevant to defendants' defense against plaintiff's claims."[18] Just as we disagree with the trial court's conclusion regarding the binding nature of the magistrate's recommendation regarding John Roe, so too do we disagree with respect to the decision to conduct an in camera inspection and to release the magistrate's decision and related documents.
 {¶ 129} In general, Civ.R. 26(B)(1) limits the scope of discovery to "any matter, not privileged, which is relevant to the subject matter involved in the pending action." In general, a trial court has broad discretion in regulating the discovery process. Dennis v. State Farm Ins. Co. (2001),143 Ohio App.3d 196, 199. The documents requested by Heap and ultimately released by the trial court exceeded those matters relevant to Heap's defenses. This was apparent even before the court conducted its in camera inspection because, as discussed hereinbefore, juvenile court recommendations and dispositions could not support the defense of truth asserted by Heap. It was therefore incumbent upon the trial court to issue an order that the requested discovery not be had. That the trial court did not do so was error. It was also error to have conducted the in camera inspection in the first instance.
 {¶ 130} Finally, we decline to accept appellant's invitation to make discovery orders for the trial court; thus, we will not make an order prohibiting appellees from using John Roe's juvenile court records for any purpose in future stages of this litigation. Such is properly addressed to the discretion of the trial court through a motion in limine or an objection at trial. Appellant's third assignment of error is therefore sustained in part and overruled in part.
 TRIAL COURT'S RECITATION OF PERTINENT FACTS {¶ 131} In his sixth assignment of error, appellant argues that the trial court's decision granting summary judgment to appellees contains an inadequate statement of facts and also contains misstatements of fact. Appellant argues these errors and omissions create uncertainty as to whether the trial court misconstrued certain facts and based its decision to grant summary judgment on misconceptions of the facts it had before it.
 {¶ 132} It is unclear what relief, if any, appellant seeks under this assignment of error. However, we feel no compulsion to take any specific action thereon because an appellate court's review of summary judgment is de novo. Koos v. Cent. OhioCellular, Inc. (1994), 94 Ohio App.3d 579, 588. We therefore conduct an independent review of the record and stand in the shoes of the trial court, examining for ourselves all items of evidence submitted in support of and in opposition to summary judgment. Jones v. Shelly Co. (1995), 106 Ohio App.3d 440, 445. We do not rely upon the trial court's statements of fact or appraisal of the facts in applying the law thereto, whether or not a party finds some fault with the trial court's explanation thereof. Accordingly, appellant's sixth assignment of error is not well taken and the same is hereby overruled.
 {¶ 133} For all of the foregoing reasons, appellant's first assignment of error is sustained with respect to his claims for defamation and wrongful intrusion, and overruled with respect to his claims for invasion of privacy by publicity, false light invasion of privacy and IIED; his second assignment of error is overruled in its entirety; his third assignment of error is sustained with respect to the trial court's prior release of documents, and appellees in possession of such documents are hereby ordered to return them to the court of common pleas within forty-five days of the entry upon this court's journal of the judgment in this case, whereupon the court of common pleas is hereby instructed to convey the same to counsel for appellant; appellant's third assignment of error is overruled with respect to his request for a prospective evidentiary order; appellant's fourth assignment of error is sustained; and his fifth and sixth assignments of error are overruled.
 {¶ 134} The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court for further proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part; causeremanded.
Bowman and Petree, jj., concur.
[1] Heap and Scheibeck are referred to collectively, infra, as "appellees."
[2] Appellant's assignments of error transect several claims, and intercross with respect to claims, parties and issues presented. Therefore, we will arrange our discussion by claim or legal right asserted, and will discuss in turn the arguments and assignments of error pertinent to each.
[3] Exceptions to this are found in Civ.R. 53(C)(3)(a), and Juv.R. 40(C)(3)(a), but are not applicable herein.
[4] This is true only as to Heap, who pled the defense of qualified privilege in her answer.
[5] We note that Heap improperly placed before the trial court excerpts from the USD Code when she attached them to her motion for summary judgment. The proper procedure for introducing evidentiary materials not specifically authorized by Civ.R. 56(C) is to incorporate them by reference into a properly framed affidavit pursuant to Civ.R. 56(E). Biskupich v. Westbay ManorNursing Home (1986), 33 Ohio App.3d 220, 222; Smith v. GuideOneIns., Franklin App. No. 02AP-1096, 2003-Ohio-4823, ¶ 14, fn. 1. Because appellant interposed no objection (and also relied on portions of the USD Code in making his arguments), the trial court was permitted, in the exercise of its discretion, to consider the USD Code in passing upon Heap's motion for summary judgment. Smith, supra, at ¶ 15, fn. 3, citing Churchwell v.Red Roof Inns, Inc. (Mar. 24, 1998), Franklin App. No. 97APE08-1125. In Churchwell, this court held that if there is no objection to evidentiary matter not specifically authorized by Civ.R. 56(C), and offered in support of, or in opposition to, a motion for summary judgment, the court in its discretion may consider the material, and any error in such consideration is waived. Churchwell, at fn. 1. But, see, Spier v. AmericanUniv. of the Caribbean (1981), 3 Ohio App.3d 28, in which the First Appellate District held that a trial court is absolutely precluded from considering any evidence not of the type specified in Civ.R. 56(C), and suggested that a reviewing court is also obligated to confine its review to only those documents found to be cognizable under Civ.R. 56(C), regardless whether the lower court so confined itself.
[6] Brief of appellee Heap at 17.
[7] Article 70, Section 470.2, USD Code.
[8] Id. at subsection (c).
[9] We observe that Central Ohio Diving never reported to USD the allegations involving John Roe, but, according to Jill McCambridge, this is because she and her husband understood that the office of the Franklin County Prosecuting Attorney had already brought the delinquency proceedings to the attention of USD officials. (Deposition of Jill McCambridge, at 41.)
[10] Scheibeck did not file a brief in this appeal.
[11] Brief of Heap at 16.
[12] In each case, the extent to which the information the defendant disclosed had already become known in the community will bear upon the analysis of whether the information was "public" or "private" at the time it was disclosed by the defendant. This is especially true where the plaintiff himself has previously publicized the information. See Greenwood v.Taft, Stettinius Hollister (1995), 105 Ohio App.3d 295, discretionary appeal not allowed (1996), 75 Ohio St.3d 1204. Here, the deposition of Jill McCambridge reveals that the fact and substance of John Roe's delinquency proceedings had been made known to USD officials by the office of the Franklin County Prosecuting Attorney, and information regarding the incident that gave rise to the proceedings was known to numerous coaches and parents involved in USD events, including many persons residing outside of Ohio. The parties' arguments do not address whether the pendency and nature of John Roe's delinquency proceedings had already become a matter of public knowledge, either within the competitive diving community or the community at large, before appellees sent their e-mail messages. Given that the parties' arguments focus narrowly on the intrinsic nature of juvenile proceedings, and appear to presume that appellees' e-mail messages constitute the first time that those within the national competitive diving community were made aware of John Roe's delinquency proceedings, we confine our analysis to the inherent nature of juvenile court proceedings, and resolve the issues in the manner in which the parties have framed and presented them at all stages of this litigation, notwithstanding other evidence in the record as to publicity having been given to the information prior to appellees' disclosures.
[13] Governmental entities are subject to various statutory prescriptions and proscriptions regarding disclosure of their records, and enjoy statutory immunity from tort liability in many instances; media organizations enjoy the protections of Section11, Article I, Ohio Constitution, the First Amendment to the United States Constitution, and certain aspects of the common law affording them greater protection from liability for invasion of privacy than that afforded non-media defendants. Because these elements are not operative in the present case, we confine our holding to situations involving non-governmental, non-media defendants.
[14] April 14, 2003 Decision, at 19.
[15] Scheibeck motion for summary judgment, at 5.
[16] Heap directs our attention to the case of Angelotta v.American Broadcasting Corp. (C.A. 6, 1987), 820 F.2d 806, wherein the Sixth Circuit Court of Appeals upheld the dismissal of the plaintiff's false light claim by the United States District Court for the Northern District of Ohio. In Angelotta, the court of appeals noted that in Yeager, the Supreme Court of Ohio "has `spoken'" on the issue of false light invasion of privacy, and "has thus far declined to adopt a false light cause of action." Id. at 808. Heap urges that this signifies that the Supreme Court of Ohio has definitively foreclosed recognition of the tort in Ohio. However, the court in Angelotta was simply observing the longstanding precept known as "the Erie Doctrine." "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case [in which the jurisdiction of the federal court is based solely on diversity of citizenship] is the law of the State." Erie R. Co. v.Tompkins (1938), 304 U.S. 64, 78, 58 S.Ct. 817. "The nub of the policy that underlies Erie R. Co. v. Tompkins is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result."Guaranty Trust Co. v. York (1945), 326 U.S. 99, 109,65 S.Ct. 1464. In upholding the district court's dismissal of the plaintiff's claim for false light invasion of privacy, the court in Angelotta remained faithful to the Erie doctrine and the "outcome determination" test developed in its progeny. However,Angelotta does not represent precedent binding on this court with respect to whether, in an appropriate case, the false light tort should be recognized. Under Erie, this is a question of state law.
[17] "The publication of highly offensive material is more difficult to avoid than the publication of defamatory information that damages a person's reputation in the community. In order to prevent liability under a false light tort, the media would need to anticipate whether statements are `highly offensive' to a reasonable person of ordinary sensibilities even though their publication does no harm to the individual's reputation. To the contrary, defamatory statements are more easily recognizable by an author or publisher because such statements are those that would damage someone's reputation in the community." The DenverPublishing Co., supra, at 903.
[18] July 17, 2002 decision granting in part and denying in part Heap's motion to obtain juvenile court file and granting in part and denying in part motion for protective order, at 4.