[Cite as *Smith v. Pierce Twp.*, 2014-Ohio-3291.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

JAMES SMITH, et al.,                          :

     Plaintiffs-Appellants,               :          CASE NO.   CA2013-10-079

                                                              :          O P I N I O N
  - vs -                                                                    7/28/2014

                                                              :

PIERCE TOWNSHIP, et al.,                    :

     Defendants-Appellees.              :

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2011 CVH 01952

W. Kenneth Zuk, 3847 Saint Annes Turn, Cincinnati, Ohio 45245, for plaintiffs-appellants, James Smith and Frances S. Kelly

Lawrence E. Barbiere, 5300 Socialville-Foster Road, Suite 200, Mason, Ohio 45040 and Warren J. Ritchie, 5300 Socialville-Foster Road, Suite 140, Mason, Ohio 45040, for defendants-appellees, Pierce Township and Bonnie Batchler

      **RINGLAND, P.J.**

     **{¶ 1}**  Plaintiffs-appellants, Frances S. Kelly and James T. Smith, appeal from a decision of the Clermont County Court of Common Pleas granting summary judgment in favor of appellees, Pierce Township Trustee Bonnie Batchler and Pierce Township (Township).  For the reasons stated below, we affirm the decision of the trial court.

     **{¶ 2}**  Kelly and Smith formerly worked for the Township.  Smith was the Township's

Chief of Police. Kelly was hired as the Township's law director in September 2010. On May 30, 2011, three Township police officers observed Smith and Kelly kissing in Smith's office. The police officers were outside Smith's office and observed the pair through a gap in the window blinds on the office door. The Township's Board of Trustees was notified and after a series of special meetings, Smith was terminated as Chief of Police on August 25, 2011. The Board of Trustees terminated Kelly from her position at the end of January 2012.

{¶ 3} Smith's office was located in the Township's administration building which housed the administration as well as the police department. Smith's office had two doors; one door went into the police department and the other door went into the administrative area. The door from the police department had a window made of frosted glass with a thin clear glass border and a set of blinds over the window on the inside of the door. The other door also had a window made of frosted glass with a thin clear glass border.

{¶ 4} In September 2010, Kelly was hired as the Township's law director on a trial basis. On April 12, 2011, Kelly and the Township entered into a "Professional Services Agreement" (Agreement) retaining Kelly to serve as the Township's law director for a period of three years, beginning on May 1, 2011 through April 30, 2014. The Agreement contained a "Financial Hardship Re-Negotiation ('Escape Clause')" which permitted the "re-negotiat[ion of] the terms of this Agreement" in the event that certain economic factors occur.

{¶ 5} On May 29, 2011, Kelly received a call from Smith while he was at the airport returning from vacation. The two agreed to meet the next day to talk about several legal issues, including allegations made against Township Police Officer Eric Pennekamp and Township Lieutenant Jeff Bachman. On May 30, Kelly entered Smith's office using her key and waited for him to arrive. When Smith arrived, the pair talked about several issues for almost an hour while the door to Smith's office was left open. When Kelly wanted to speak about Pennekamp and Bachman, she closed the door and the two continued their

discussion. Sometime after closing the door, Kelly walked over toward the office desk and was standing near it when Smith kissed her. In Kelly's deposition, she explained that she was wearing a skirt that day and leaned back and fell backward on the desk while Smith was moving toward her, pulled her into a sitting position, and kissed her. The two kissed and hugged each other. Smith and Kelly both estimated that the kissing lasted approximately one to two minutes. Smith and Kelly had kissed in Smith's office on previous occasions, approximately four or five other times.

{¶ 6} Bachman and Police Officer Laetitia Schuler observed Smith and Kelly kissing in Smith's office through the clear glass border. After the kiss ended, Bachman, Schuler, and Pennekamp entered Smith's office and asked to speak with him privately. The officers informed Smith that they looked through the shade on the window and saw inappropriate behavior and kissing between the pair. Unbeknownst to Smith, the officers were recording the conversation. During the conversation, Smith replied "yes" to a question that Kelly was on his desk "with her legs spread and her skirt pulled up and [Smith was] in front of her." Smith also acknowledged that what occurred between Kelly and himself "was not appropriate" and that he got "carried away."

{¶ 7} After the discussion with the officers, Smith and Kelly discussed the incident with Township administrator, David Elmer. Elmer also met with Bachman, Pennekamp, and Schuler. The next day, Elmer met with Trustee Batchler and informed her about the situation. Batchler met with the three officers and instructed them to provide written statements regarding what they observed. The officers provided these statements which Batchler immediately forwarded to the prosecutor's office. Batchler then recounted the officer's statements to Karen Register, the Township's fiscal officer.

{¶ 8} The Township's Board of Trustees held a series of special meetings to discuss the future employment or discipline of Smith. During these meetings, the Trustees went into

executive session when discussing Smith's future employment. The Township sent out notices for each of these meetings. On August 25, 2011, Smith was terminated from his position as Chief of Police. Kelly was kept on as law director until the end of January 2012, when the Board voted to terminate her employment.

{¶ 9} On June 28, 2012, Smith and Kelly filed suit against the Township and Batchler. In regards to the Township, Kelly alleged that her employment contract was breached and Kelly and Smith alleged that their privacy was invaded. In regards to Batchler, Kelly and Smith argued that Batchler defamed the pair and damaged their reputations. The Township and Batchler moved for summary judgment on all of the claims. Kelly filed a motion for partial summary judgment regarding her breach of contract claim. On September 11, 2013, the trial court granted the Township's and Batchler's motion for summary judgment.

{¶ 10} Kelly and Smith now appeal, asserting five assignments of error.

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE APPELLEES ON THE CONTRACT OF FRANCES S. KELLY.

{¶ 13} Assignment of Error No. 2:

{¶ 14} THE TRIAL COURT ERRED IN FINDING DEFENDANT BATCHLER IMMUNE FROM SUIT.

{¶ 15} Assignment of Error No. 3:

{¶ 16} THE TRIAL COURT ERRED IN FINDING THERE WAS NO REASONABLE EXPECTATION OF PRIVACY IN THE OFFICE OF CHIEF SMITH AND GRANTING SUMMARY JUDGMENT TO THE APPELLEES.

{¶ 17} Assignment of Error No. 4:

{¶ 18} THE TRIAL COURT ERRED IN FINDING THERE WAS NO WRONGFUL INTRUSION AS A MATTER OF LAW AND GRANTING SUMMARY JUDGMENT TO THE

APPELLEE.

{¶ 19} Assignment of Error No. 5:

{¶ 20} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEES ON THE ISSUES OF PUBLICITY AND DEFAMATION.

{¶ 21} Kelly and Smith challenge the trial court's grant of summary judgment in favor of Batchler and the Township on multiple bases. Summary judgment is a procedural device used to terminate litigation when there are no issues in a case requiring a formal trial. *Roberts v. RMB Ents., Inc.*, 197 Ohio App.3d 435, 2011-Ohio-6223, ¶ 6 (12th Dist.). On appeal, a trial court's decision granting summary judgment is reviewed de novo. *Moody v. Pilot Travel Ctrs., L.L.C.*, 12th Dist. Butler No. CA2011-07-141, 2012-Ohio-1478, ¶ 7. In applying the de novo standard, the appellate court is required to "us[e] the same standard that the trial court should have used, and * * * examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Bravard v. Curran*, 155 Ohio App.3d 713, 2004-Ohio-181, ¶ 9 (12th Dist.).

{¶ 22} Pursuant to Civ.R. 56, a trial court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party. *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17 (12th Dist.). The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists. *Touhey v. Ed's Tree & Turf, L.L.C.*, 194 Ohio App.3d 800, 2011-Ohio-3432, ¶ 7 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996).

{¶ 23} Once this burden is met, the nonmoving party must then present evidence to show that there is some issue of material fact yet remaining for the trial court to resolve. *Smedley v. Discount Drug Mart, Inc.*, 190 Ohio App.3d 684, 2010-Ohio-5665, ¶ 11 (12th

Dist.). In determining whether a genuine issue of material fact exists, the evidence must be construed in the nonmoving party's favor. *Walters v. Middletown Properties Co.*, 12th Dist. Butler No. CA2001-10-249, 2002-Ohio-3730, ¶ 10. We are mindful of these principles in addressing the following assignments of error.

## Breach of Contract

{¶ 24} In the first assignment of error, Kelly argues the court erred when it granted summary judgment to the Township on her breach of contract claim. Kelly maintains that the Agreement provided the exclusive means to terminate her employment and she is entitled to her salary from the time she was dismissed until she otherwise found employment because her termination breached the Agreement. Essentially, Kelly argues that the "Escape Clause" in the Agreement provided the exclusive means for the Township to terminate her employment. Additionally, Kelly argues that she is entitled to damages because she declined other employment opportunities based on the Township's representation that she would be employed for three years.

{¶ 25} A client has the right to discharge an attorney at any time. *Frick, Preston & Assoc. v. Martin*, 10th Dist. Franklin No. 10AP-1208, 2011-Ohio-4428, ¶ 11. When a client terminates his relationship with the attorney, the attorney is only entitled to recover the reasonable value of services rendered to the client prior to the discharge on the basis of quantum meruit. *Id.* at ¶ 12. An attorney can no longer recover on the basis of breach of contract. *Fox & Associates Co., L.P.A. v. Purdon*, 44 Ohio St.3d 69, 71 (1989). Clients are only liable on the basis of quantum meruit because "[t]he overriding consideration in the attorney-client relationship is trust and confidence" and "[t]he right to discharge one's attorney would be of little value if the client were liable for the full contract price." *Id.* Therefore, "[t]o force such an agreement into the conventional status of commercial contracts ignores the unique, fiduciary relationship created by an attorney's representation of a client."

- 6 -

*Id.*

{¶ 26} However, the Second District has noted that "circumstances may arise in which attorneys may be able to recover costs above the legal services he or she has already rendered." *Moraine v. Lewis*, 151 Ohio App.3d 526, 2003-Ohio-460, ¶ 33 (2d Dist.), citing *Columbus Bar Ass'n. v. Klos*, 81 Ohio St.3d 486, 498 (1998). If an attorney forgoes other potential employment, particularly for a competitor of his or her client, based on his obligation to a client who later ends the attorney/client relationship prior to the end of their contractual agreement, he or she may be entitled to compensation if the agreement with the client allows it. *Id. See Frick* at ¶ 12.

{¶ 27} The Agreement provided that the Township was retaining Kelly to serve as the law director for a period of three years, beginning on May 1, 2011 through April 30, 2014. The Agreement also contained a "Financial Hardship Re-Negotiation ('Escape Clause')" provision which provided:

> * * * [T]he parties agree that, in the event that the economic factors specified below should converge, the terms of this contract shall be deemed impossible for the Township to fulfill. The parties further recognize that, should this Agreement become impossible to fulfill, the Township will nonetheless continue to require legal services and that Kelly will be in the position most advantageous to the Township to continue to provide such legal services due to familiarity with pending and threatened lawsuits and the particular problems and challenges experienced by the Township. Therefore, in the event that this 'escape clause' should be activated by the following conditions converging, the parties agree to re-negotiate the terms of this Agreement for Professional Services in good faith. * * *

{¶ 28} The Township did not breach the Agreement by terminating Kelly's employment in January 2012. The Township was Kelly's client and as such it had the absolute right to discharge Kelly at any time whether or not Kelly had an employment contract. The Township is only liable to pay Kelly for the services she rendered on the basis of quantum meruit and Kelly received these expenses. Therefore, the Township is not required to pay Kelly her

salary from her termination in January 2012 until she became otherwise employed in July 2013. Additionally, the "Escape Clause" did not specify that the only way Kelly could be terminated was according to this clause. Instead, this clause merely addressed the situation where when certain economic factors occur, "the terms of this contract shall be deemed impossible for the Township to fulfill" and "the parties agree to re-negotiate the terms of this Agreement."

{¶ 29} Kelly argues that she is entitled to damages above the fees for the legal services she has already rendered because she relied on the good faith of the Township in granting her a three-year employment contract and she would have otherwise sought other employment. Kelly is essentially making a promissory estoppel argument as she is arguing that that the Township made a promise and she reasonably relied on this promise in not seeking other employment opportunities. Under the doctrine of promissory estoppel, "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does in fact induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Condon v. Body, Vickers & Daniels*, 99 Ohio App.3d 12, 20 (8th Dist.1994).

{¶ 30} However, Kelly's argument is unpersuasive as the Supreme Court has held that "the doctrines of equitable estoppel and promissory estoppel are inapplicable against a political subdivision when the political subdivision is engaged in a governmental function." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, syllabus. *See Schmitt v. Educational Serv. Ctr. of Cuyahoga Cty.*, 8th Dist. Cuyahoga No. 97623, 2012-Ohio-2210, ¶ 18. The employment of Kelly as a law director is a governmental function. *See* R.C. 2744.01(C)(1) and (C)(2)(f); *Slye v. London Police Dept.*, 12th Dist. Madison No. CA2009-12-027, 2010-Ohio-2824, ¶ 38.

{¶ 31} Consequently, the trial court did not err in granting summary judgment on

Kelly's breach of contract claim. The Township could fire Kelly at any time and Kelly was only entitled to the fees she rendered on the basis of quantum meruit. Additionally, Kelly did not fall into the exception as promissory estoppel is inapplicable to political subdivisions engaged in governmental functions. The first assignment of error is overruled.

**Political Subdivision Employee Immunity**

{¶ 32} In the second assignment of error, Kelly and Smith argue that the court erred when it determined that Batchler was immune from tort liability. Kelly's and Smith's sole cause of action against Batchler was that she defamed them when she repeated false statements made by the police officers who observed the May 30 incident. Kelly and Smith argue that Batchler is not entitled to political subdivision employee immunity regarding this claim because she acted maliciously and outside the scope of her employment. Specifically, Kelly and Smith maintain that Batchler was malicious when she: 1) instructed the officers to make written statements about their observations of Smith; 2) recounted the officers' statement, "[Kelly] had her hands in Chief Smith's pants" to Register, the Township's fiscal officer; and 3) published these statements to two individuals. Kelly and Smith assert Batchler was malicious because she failed to determine the validity of the officers' statements and she had a high degree of awareness that these claims were false.

{¶ 33} Ohio law provides immunity for employees of political subdivisions under R.C. 2744.03(A)(6). The parties do not dispute that the Township is a political subdivision pursuant to R.C. 2744.01(F) and Batchler is an employee of the Township under R.C. 2744.01(B). Therefore, our inquiry turns on whether one of the exceptions to political subdivision employee immunity applies to Batchler.

{¶ 34} A political subdivision employee is immune from liability in a civil action for claims arising from the employee's official actions *unless* one of three exceptions applies: (a) the employee's acts were manifestly outside the scope of employment or official

- 9 -

responsibilities; (b) the acts were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) liability is expressly imposed by another section of the Revised Code. R.C. 2744.03(A)(6)(a)-(c). The only two exceptions relevant to this appeal are the exceptions under R.C. 2744.03(A)(6)(a) and (b).

{¶ 35} R.C. Chapter 2744 does not define the type of employee acts that fall "manifestly outside the scope of employment or official responsibilities" under R.C. 2744.03(A)(6)(a). However, Ohio courts have generally drawn from agency-law principles to hold that "conduct is within the scope of employment if it is initiated, in part, to further or promote the master's business." *Curry v. Blanchester*, 12th Dist. Clinton No. CA2009-08-010, 2010-Ohio-3368, ¶ 30, quoting *Jackson v. McDonald*, 144 Ohio App.3d 301, 307 (5th Dist.2001). "In the context of immunity, '[a]n employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take the act manifestly outside the scope of employment.'" *Id.* "It is only where the acts of state employees are motivated by actual malice or other [situations] giving rise to punitive damages that their conduct may be outside the scope of their state employment." *Id.*

{¶ 36} "Malice" is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified. *Frazier v. Clinton Cty. Sheriff's Office*, 12th Dist. Clinton No. CA2008-04-015, 2008-Ohio-6064, ¶ 36. "Bad faith" involves a dishonest purpose, conscious wrongdoing, the intent to mislead or deceive, or the breach of a known duty through some ulterior motive or ill will. *Id.* An individual acts in a "wanton" manner when that person fails "to exercise any care toward those to whom a duty of care is owed in circumstances which there is a great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 33. Finally, a person acts in a "reckless" manner when that individual "causes an unreasonable risk of harm" and engages in misconduct "substantially greater than that which is necessary to

make the conduct negligent." *Frazier* at ¶ 36, citing *Thompson v. McNeil*, 53 Ohio St.3d 102, 104-105 (1990).

{¶ 37} In the present case, Batchler spoke with Bachman, Schuller and Pennekamp after the incident. Batchler informed the officers that they were free to write a statement about what they observed. Schuler's statement indicated that she observed Kelly's "hand inside the crouch (sic) area of the chief's pants * * * Smith grabbed his crouch (sic) area a few times * * * I observed Fran sitting on the chief's desk with her skirt raised and the chief standing in between her legs making forward and back motions with his body * * * I then observed Col. Smith and [Kelly] move the desk back into position." Bachman's statement specified that Kelly was "sitting on the edge of the chief's desk with her skirt pulled up to her waist, her legs spread apart, and the chief thrusting in and out between her legs. The chief was fully clothed and from my angle I could not tell if the chief's zipper was down." Additionally, Pennekamp testified in this deposition that he routinely observed officers "bent over looking into the chief's office by his door" and that the officers would routinely "peer in to see if he was in a meeting or if he was on the phone before knocking." The officers conveyed the observations they made in the written statements regarding Kelly and Smith to Batchler.

{¶ 38} Upon receiving these statements, Batchler immediately forwarded them to the prosecutor's office. On two or three occasions, Batchler met with Register and related to her the officers' observations regarding incident between Smith and Kelly. In his deposition, Smith testified that during one of these meetings, Batchler told Register that "[Kelly] had her hands in Chief Smith's pants."

{¶ 39} The trial court did not err in finding that Batchler was entitled to immunity as an employee of a political subdivision. Batchler did not maliciously, in bad faith, wantonly, or recklessly request the officers to make a written statement about what they observed in

Smith's office. Batchler instructed the officers to provide these statements after their allegations regarding Smith's and Kelly's behavior had come to light and the issue of the continued employment of these individuals was to be discussed in an executive session. Similarly, Batchler did not maliciously, in bad faith, wantonly, or recklessly inform Register what the officers told her about their observation that Kelly "had her hands in Chief Smith's pants." Instead, Batchler relayed the relevant information of the officers' observations to the Township fiscal officer. It is reasonable that Batchler, as a Township Trustee, would inform the Township fiscal officer about the accounts of witnesses to employee misconduct during the pendency of disciplinary proceedings that might result in the termination of employment of those two employees.

{¶ 40} Kelly's and Smith's assertion that Batchler acted maliciously because the officers' observations could not have been true and she failed to investigate the truthfulness of the claims is also not supported by the evidence. During Smith's deposition, he disputed the officers' observations because the window into his office was made of frosted glass with a set of blinds over the window. After the incident, Smith took a polygraph where he denied ever having sexual intercourse or oral sex with Kelly and denied that Kelly "put her hand in [his] pants or was kneeling on the floor "before him in his office." The polygraph test showed "a complete absence of deception." Despite Smith's assertions, Pennekamp testified that the officers routinely look through the window to Smith's office before they knock on the door. Further, whether the officers' statements were not completely accurate does not diminish the relevance of the statements as the officers' accounts would be discussed at the executive session regarding the employment of Smith and Kelly.

{¶ 41} Lastly, Kelly and Smith have failed to provide any evidence that this statement was published to the two individuals, Curt Harman or Stitt. Kelly and Smith have failed to offer any sworn statements establishing what was said to these unknown individuals and

Smith testified that he did not know the identity of any third party to whom Batchler made any statements.

{¶ 42} Consequently, the trial court did not err in finding that Batchler was immune from suit pursuant to R.C. 2744.03 as she is an employee of a political subdivision. Therefore, Kelly's and Smith's second assignment of error is overruled.

## Invasion of Privacy- Wrongful Intrusion

{¶ 43} Kelly and Smith challenge the court's grant of summary judgment on their invasion of privacy-wrongful intrusion cause of action. Specifically, in the third assignment of error, Kelly and Smith argue that the court erred in finding that they did not have any reasonable expectation of privacy in Smith's office. In the fourth assignment of error, Kelly and Smith also maintain that the court erred in finding that the police officer's action in peering into Smith's office was not highly offensive to a reasonable person. As both of these arguments address different elements of the invasion of privacy-wrongful intrusion claim, we will address these assignments of error together.

{¶ 44} The tort of invasion of privacy includes four separate torts: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness. *Curry*, 2010-Ohio-3368 at ¶ 57. In this case, Kelly and Smith asserted that the police officers' wrongfully intruded upon their seclusion when the officers peered into the window into Smith's office and the Township is liable for this wrongful intrusion.

{¶ 45} The Ohio Supreme Court has held that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Hamrick v. Wellman Products Group*, 9th Dist.

Medina No. 03CA0146-M, 2004-Ohio-5170, ¶ 33, quoting *Sustin v. Fee*, 69 Ohio St.2d 143, 145 (1982). The intrusion must be into a plaintiff's private affairs and the plaintiff must have a "reasonable expectation of privacy" in the area allegedly intruded. *Turner v. Shahed Ents.*, 10th Dist. Franklin No. 10AP-892, 2011-Ohio-4654, ¶ 21.

**{¶ 46}** The intrusion must be wrongful, as well as done in a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. *Roe ex rel. Roe v. Heap*, 10th Dist. Franklin No. 03AP-586, 2004-Ohio-2504, ¶ 82. "'Wrongful' does not require that the intrusion itself be wrongful in the sense that there is no right to make any intrusion. Rather, 'wrongful' may relate to the manner of the making of the intrusion * * *." *Id.*, quoting *Strutner v. Dispatch Printing Co.*, 2 Ohio App.3d 377, 378-379 (10th Dist.1982).

**{¶ 47}** The action of the officers in looking into Smith's office through a gap in the window blinds is not highly offensive to a reasonable person nor was the intrusion of such a character as would shock the ordinary person to the point of emotional distress. The officers were peering into the Township's chief of police's office that is located in the county's public administration building. The officers testified that they commonly peered into the gap on the window blinds covering the door before entering Smith's office to determine if he was talking on the phone or if he was busy. The officers also stated that they heard kissing noises coming from Smith's office from the hallway. As the trial court noted "the officers were not peering into the chief's bedroom in his home," but instead were looking into his office. Therefore, there was no genuine issue of material fact that the officers' actions in peering into Smith's office were highly offensive.

**{¶ 48}** As the court did not err in determining that the officers' actions were not highly offensive, there was no error in granting summary judgment in favor of the Township on Kelly's and Smith's invasion of privacy-wrongful intrusion claim. Because we find that intrusion was not wrongful or highly offensive to a reasonable person, we do not need to

determine whether Smith or Kelly had a reasonable expectation of privacy in Smith's office. Kelly's and Smith's third and fourth assignments of error are overruled.

## Defamation

{¶ 49} In the fifth assignment of error, Kelly and Smith challenge the court's grant of summary judgment in favor of Batchler under their defamation claim. As we have determined that Batchler is immune from liability, the trial court also did not err in granting summary judgment to Batchler under the defamation action. *See* R.C. 2744.03(A)(6). Kelly's and Smith's fifth assignment of error is overruled regarding the court's grant of summary judgment in favor of Batchler under the defamation claim.

## Invasion of Privacy- Publicity Theory

{¶ 50} Also in the fifth assignment of error, Kelly and Smith challenge the trial court's grant of summary judgment in favor of the Township on their claim of invasion of privacy under a publicity theory.[1] Kelly and Smith maintain that the Township was liable under this theory because of the manner in which it handled the termination of Smith. They assert that the Township publicly disclosed private facts when it scheduled several special meetings to discuss Smith's termination and failed to correct the media about the "false" allegations of sexual misconduct.

{¶ 51} To establish a claim of invasion of privacy under a publicity theory, a plaintiff must prove that (1) there was publicity, the disclosure must be of a public nature, not private; (2) the facts disclosed concerned an individual's private life, not his public life; (3) the matter publicized would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) the publication was made intentionally, not negligently; and (5) the matter

---

1. In their fifth assignment, Kelly and Smith also imply that the Township is liable under a defamation theory. Kelly's and Smith's complaint only asserted that Batchler was liable under defamation. Therefore, because Kelly and Smith did not assert a defamation claim against the Township, we will only analyze the Township's liability on invasion of privacy under a publicity theory.

publicized was not of legitimate concern to the public. *Curry*, 2010-Ohio-3368 at ¶ 59. "'Publicity' means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person." *Id.*

{¶ 52} In the present case, after the allegations came to light regarding the incident between Smith and Kelly, the Township scheduled a special meeting for June 3, 2011. The Township issued a notice stating the meeting would be held, "[t]o announce the retirement of Police Chief Col. James T. Smith; to enter into executive session to discuss personnel matters – employment/ appointment/ compensation/ promotion and legal matters; and to discuss any other matters before the board." During the June 3 special meeting, the trustees convened into a lengthy executive session. When the executive session ended, a local attorney stood up and asked what the Trustees were going to do about the "gross sexual misconduct" between Smith and Kelly. Batchler replied that they were not going to discuss that issue.

{¶ 53} Special meetings were also held on June 20 and June 24, 2011. The notices for both of these meetings stated the purpose was "to enter into executive session to discuss personnel matters – discipline/dismissal and any other matters to come before the board." A name-clearing hearing was scheduled for July 6, 2011, with the notice stating the purpose was "to conduct a Name-Clearing Hearing as requested by Pierce Township Chief James Smith and to enter into Executive Session to discuss personnel matters – discipline/dismissal – R.C. 121.22(G)(1); and to discuss any other before the Board." Smith did not attend the name-clearing hearing on July 6 nor did he attend the rescheduled hearing on August 24, 2011.

{¶ 54} Additionally, the record contains an article submitted from a local newspaper

titled, "Pierce Twp. Needs some spring cleaning." In the article, the guest columnist wrote that Smith and Kelly "were apparently caught in a questionable situation on a holiday in the chief's office. There were witnesses to what happened but both Ms. Kelly and Chief Smith have denied that there was anything other than 'smooching' and comforting hugs."

{¶ 55} The trial court did not err in granting summary judgment on the publicity invasion of privacy claim. The Township did not publicly disclose any private facts regarding Smith or Kelly when it scheduled the special meetings to discuss Smith's employment. During the meetings, the Township did not publicly discuss the conduct between Smith and Kelly and went into executive session to discuss the discipline of Smith. The Township was authorized by law to conduct the special meetings and to go into executive session regarding Smith's employment. *See* R.C. 121.22(F) and (G)(1). The Township was required by law to give notices regarding these special meetings. R.C. 121.22(F). Further, the notices, which generally stated that the meetings concerned the discipline and/or retirement of Smith did not disclose any private facts and the disclosure would not be highly offensive to a reasonable person.

{¶ 56} Additionally, the Township is not liable for failing to issue a public statement to refute the media reports of sexual misconduct between Kelly and Smith. Kelly and Smith have failed to point to any act on the part of the Township that constituted a public disclosure. *See Curry* at ¶ 62. Instead, the Township issued general notices, required by law, regarding the special meetings and entered into executive session to discuss Smith's employment. The failure to issue a press statement regarding Kelly and Smith' conduct does not constitute a public disclosure and Kelly and Smith have not cited any law that the Township had a duty to stop the media reports. Consequently, the trial court did not err in granting summary judgment in favor of the Township on the publicity invasion of privacy claim.

{¶ 57} To the extent that Kelly and Smith argued the court erred in granting summary

judgment in favor of the Township on Kelly's and Smith's invasion of privacy under a publicity theory, Kelly's and Smith's fifth assignment of error is overruled.

{¶ 58} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.